PROCUNIER, CORRECTIONS DIRECTOR, ET AL. *v.*
MARTINEZ ET AL.

No. 72–1465.   Argued December 3, 1973—Decided April 29, 1974

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, BLACKMUN, and REHNQUIST, JJ., joined: MARSHALL, J., filed a concurring opinion, in which BRENNAN, J., joined and in Part II of which DOUGLAS, J., joined, *post*, p. 422. DOUGLAS, J., filed an opinion concurring in the judgment, *post*, p. 428.

*W. Eric Collins,* Deputy Attorney General of California, argued the cause for appellants. With him on the briefs were *Evelle J. Younger,* Attorney General, *Edward A. Hinz, Jr.,* Chief Assistant Attorney General, *Doris H. Maier,* Assistant Attorney General, and *Robert R. Granucci* and *Thomas A. Brady,* Deputy Attorneys General.

*William Bennett Turner* argued the cause for appellees. With him on the brief were *Mario Obledo, Sanford Jay Rosen, Anthony G. Amsterdam, Jack Greenberg, James M. Nabrit III, Stanley A. Bass, Lowell Johnston,* and *Alice Daniel.**

*Briefs of *amici curiae* urging affirmance were filed by *William R. Fry* for the National Paralegal Institute, and by *Sheldon Krantz* and

Mr. Justice Powell delivered the opinion of the Court.

This case concerns the constitutionality of certain regulations promulgated by appellant Procunier in his capacity as Director of the California Department of Corrections. Appellees brought a class action on behalf of themselves and all other inmates of penal institutions under the Department's jurisdiction to challenge the rules relating to censorship of prisoner mail and the ban against the use of law students and legal paraprofessionals to conduct attorney-client interviews with inmates. Pursuant to 28 U. S. C. § 2281 a three-judge United States District Court was convened to hear appellees' request for declaratory and injunctive relief. That court entered summary judgment enjoining continued enforcement of the rules in question and ordering appellants to submit new regulations for the court's approval. 354 F. Supp. 1092 (ND Cal. 1973). Appellants' first revisions resulted in counterproposals by appellees and a court order issued May 30, 1973, requiring further modification of the proposed rules. The second set of revised regulations was approved by the District Court on July 20, 1973, over appellees' objections. While the first proposed revisions of the Department's regulations were pending before the District Court, appellants brought this appeal to contest that court's decision holding the original regulations unconstitutional.

We noted probable jurisdiction. 412 U. S. 948 (1973). We affirm.

I

First we consider the constitutionality of the Director's rules restricting the personal correspondence of prison inmates. Under these regulations, correspondence be-

Stephen Joel Trachtenberg for the Center for Criminal Justice, Boston University School of Law.

tween inmates of California penal institutions and persons other than licensed attorneys and holders of public office was censored for nonconformity to certain standards. Rule 2401 stated the Department's general premise that personal correspondence by prisoners is "a privilege, not a right . . . ."[1] More detailed regulations implemented the Department's policy. Rule 1201 directed inmates not to write letters in which they "unduly complain" or "magnify grievances."[2] Rule 1205 (d) defined as contraband writings "expressing inflammatory political, racial, religious or other views or beliefs . . . ."[3] Finally, Rule 2402 (8) provided that inmates "may not send or receive letters that pertain to criminal activity;

---

[1] Director's Rule 2401 provided:

"The sending and receiving of mail is a privilege, not a right, and any violation of the rules governing mail privileges either by you or by your correspondents may cause suspension of the mail privileges."

[2] Director's Rule 1201 provided:

"INMATE BEHAVIOR: Always conduct yourself in an orderly manner. Do not fight or take part in horseplay or physical encounters except as part of the regular athletic program. Do not agitate, unduly complain, magnify grievances, or behave in any way which might lead to violence."

It is undisputed that the phrases "unduly complain" and "magnify grievances" were applied to personal correspondence.

[3] Director's Rule 1205 provided:

"The following is contraband:

"d. Any writings or voice recordings expressing inflammatory political, racial, religious or other views or beliefs when not in the immediate possession of the originator, or when the originator's possession is used to subvert prison discipline by display or circulation."

Rule 1205 also provides that writings "not defined as contraband under this rule, but which, if circulated among other inmates, would in the judgment of the warden or superintendent tend to subvert prison order or discipline, may be placed in the inmate's property, to which he shall have access under supervision."

are lewd, obscene, or defamatory; contain foreign matter, or are otherwise inappropriate." [4]

Prison employees screened both incoming and outgoing personal mail for violations of these regulations. No further criteria were provided to help members of the mailroom staff decide whether a particular letter contravened any prison rule or policy. When a prison employee found a letter objectionable, he could take one or more of the following actions: (1) refuse to mail or deliver the letter and return it to the author; (2) submit a disciplinary report, which could lead to suspension of mail privileges or other sanctions; or (3) place a copy of the letter or a summary of its contents in the prisoner's file, where it might be a factor in determining the inmate's work and housing assignments and in setting a date for parole eligibility.

The District Court held that the regulations relating to prisoner mail authorized censorship of protected expression without adequate justification in violation of the First Amendment and that they were void for vagueness. The court also noted that the regulations failed to provide minimum procedural safeguards against error and arbitrariness in the censorship of inmate correspondence. Consequently, it enjoined their continued enforcement.

Appellants contended that the District Court should have abstained from deciding these questions. In that court appellants advanced no reason for abstention other than the assertion that the federal court should defer to the California courts on the basis of comity. The District Court properly rejected this suggestion, noting that the

---

[4] At the time of appellees' amended complaint, Rule 2402 (8) included prohibitions against "prison gossip or discussion of other inmates." Before the first opinion of the District Court, these provisions were deleted, and the phrase "contain foreign matter" was substituted in their stead.

mere possibility that a state court might declare the prison regulations unconstitutional is no ground for abstention. *Wisconsin* v. *Constantineau,* 400 U. S. 433, 439 (1971).

Appellants now contend that we should vacate the judgment and remand the case to the District Court with instructions to abstain on the basis of two arguments not presented to it. First, they contend that any vagueness challenge to an uninterpreted state statute or regulation is a proper case for abstention. According to appellants, "[t]he very statement by the district court that the regulations are vague constitutes a compelling reason for abstention." Brief for Appellants 8–9. As this Court made plain in *Baggett* v. *Bullitt,* 377 U. S. 360 (1964), however, not every vagueness challenge to an uninterpreted state statute or regulation constitutes a proper case for abstention.[5] But we need not decide whether appellants' contention is controlled by the analysis in *Baggett,* for the short

---

[5] In *Baggett* the Court considered the constitutionality of loyalty oaths required of certain state employees as a condition of employment. For the purpose of applying the doctrine of abstention the Court distinguished between two kinds of vagueness attacks. Where the case turns on the applicability of a state statute or regulation to a particular person or a defined course of conduct, resolution of the unsettled question of state law may eliminate any need for constitutional adjudication. 377 U. S., at 376–377. Abstention is therefore appropriate. Where, however, as in this case, the statute or regulation is challenged as vague because individuals to whom it plainly applies simply cannot understand what is required of them and do not wish to forswear all activity arguably within the scope of the vague terms, abstention is not required. *Id.,* at 378. In such a case no single adjudication by a state court could eliminate the constitutional difficulty. Rather it would require "extensive adjudications, under the impact of a variety of factual situations," to bring the challenged statute or regulation "within the bounds of permissible constitutional certainty." *Ibid.*

answer to their argument is that these regulations were neither challenged nor invalidated solely on the ground of vagueness. Appellees also asserted, and the District Court found, that the rules relating to prisoner mail permitted censorship of constitutionally protected expression without adequate justification. In light of the successful First Amendment attack on these regulations, the District Court's conclusion that they were also unconstitutionally vague hardly "constitutes a compelling reason for abstention."

As a second ground for abstention appellants rely on Cal. Penal Code § 2600 (4), which assures prisoners the right to receive books, magazines, and periodicals.[6] Although they did not advance this argument to the District Court, appellants now contend that the interpretation of the statute by the state courts and its application to the regulations governing prisoner mail might avoid or modify the constitutional questions decided below. Thus appellants seek to establish the essential prerequisite for abstention—"an uncertain issue of state

---

[6] Cal. Penal Code § 2600 provides that "[a] sentence of imprisonment in a state prison for any term suspends all the civil rights of the person so sentenced . . . ," and it allows for partial restoration of those rights by the California Adult Authority. The statute then declares, in pertinent part:

"This section shall be construed so as not to deprive such person of the following civil rights, in accordance with the laws of this state:

"(4) To purchase, receive, and read any and all newspapers, periodicals, and books accepted for distribution by the United States Post Office. Pursuant to the provisions of this section, prison authorities shall have the authority to exclude obscene publications or writings, and mail containing information concerning where, how, or from whom such matter may be obtained; and any matter of a character tending to incite murder, arson, riot, violent racism, or any other form of violence; and any matter concerning gambling or a lottery. . . ."

law," the resolution of which may eliminate or materially alter the federal constitutional question.[7] *Harman* v. *Forssenius,* 380 U. S. 528, 534 (1965). We are not persuaded.

A state court interpretation of § 2600 (4) would not avoid or substantially modify the constitutional question presented here. That statute does not contain any provision purporting to regulate censorship of personal correspondence. It only preserves the right of inmates to receive "newspapers, periodicals, and books" and authorizes prison officials to exclude "obscene publications or writings, and mail containing information concerning

---

[7] Appellants argue that the correctness of their abstention argument is demonstrated by the District Court's disposition of Count II of appellees' amended complaint. In Count II appellees challenged the mail regulations on the ground that their application to correspondence between inmates and attorneys contravened the Sixth and Fourteenth Amendments. Appellees later discovered that a case was then pending before the Supreme Court of California in which the application of the prison rules to attorney-client mail was being attacked under subsection (2) of § 2600, which provides:

"This section shall be construed so as not to deprive [an inmate] of the following civil rights, in accordance with the laws of this state:

"(2) To correspond, confidentially, with any member of the State Bar, or holder of public office, provided that the prison authorities may open and inspect such mail to search for contraband."

The District Court did stay its hand, and the subsequent decision in *In re Jordan,* 7 Cal. 3d 930, 500 P. 2d 873 (1972) (holding that § 2600 (2) barred censorship of attorney-client correspondence), rendered Count II moot. This disposition of the claim relating to attorney-client mail is, however, quite irrelevant to appellants' contention that the District Court should have abstained from deciding whether the mail regulations are constitutional as they apply to personal mail. Subsection (2) of § 2600 speaks directly to the issue of censorship of attorney-client mail but says nothing at all about personal correspondence, and appellants have not informed us of any challenge to the censorship of personal mail presently pending in the state courts.

where, how, or from whom *such matter* may be obtained . . ." (emphasis added). And the plain meaning of the language is reinforced by recent legislative history. In 1972, a bill was introduced in the California Legislature to restrict censorship of personal correspondence by adding an entirely new subsection to § 2600. The legislature passed the bill, but it was vetoed by Governor Reagan. In light of this history, we think it plain that no reasonable interpretation of § 2600 (4) would avoid or modify the federal constitutional question decided below. Moreover, we are mindful of the high cost of abstention when the federal constitutional challenge concerns facial repugnance to the First Amendment. *Zwickler* v. *Koota,* 389 U. S. 241, 252 (1967); *Baggett* v. *Bullitt,* 377 U. S., at 379. We therefore proceed to the merits.

## A

Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions.[8] More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons

---

[8] See Note, Decency and Fairness: An Emerging Judicial Role in Prison Reform, 57 Va. L. Rev. 841, 842–844 (1971).

in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.[9] Judicial recognition of that fact reflects no more than a healthy sense of realism. Moreover, where state penal institutions are involved, federal courts have a further reason for deference to the appropriate prison authorities.

But a policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims whether arising in a federal or state institution. When a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect consti-

---

[9] They are also ill suited to act as the front-line agencies for the consideration and resolution of the infinite variety of prisoner complaints. Moreover, the capacity of our criminal justice system to deal fairly and fully with legitimate claims will be impaired by a burgeoning increase of frivolous prisoner complaints. As one means of alleviating this problem, THE CHIEF JUSTICE has suggested that federal and state authorities explore the possibility of instituting internal administrative procedures for disposition of inmate grievances. 59 A. B. A. J. 1125, 1128 (1973). At the Third Circuit Judicial Conference meeting of October 15, 1973, at which the problem was addressed, suggestions also included (i) abstention where appropriate to avoid needless consideration of federal constitutional issues; and (ii) the use of federal magistrates who could be sent into penal institutions to conduct hearings and make findings of fact. We emphasize that we express no view as to the merit or validity of any particular proposal, but we do think it appropriate to indicate the necessity of prompt and thoughtful consideration by responsible federal and state authorities of this worsening situation.

tutional rights. *Johnson* v. *Avery,* 393 U. S. 483, 486 (1969). This is such a case. Although the District Court found the regulations relating to prisoner mail deficient in several respects, the first and principal basis for its decision was the constitutional command of the First Amendment, as applied to the States by the Fourteenth Amendment.[10]

The issue before us is the appropriate standard of review for prison regulations restricting freedom of speech. This Court has not previously addressed this question, and the tension between the traditional policy of judicial restraint regarding prisoner complaints and the need to protect constitutional rights has led the federal courts to adopt a variety of widely inconsistent approaches to the problem. Some have maintained a hands-off posture in the face of constitutional challenges to censorship of prisoner mail. *E. g., McCloskey* v. *Maryland,* 337 F. 2d 72 (CA4 1964); *Lee* v. *Tahash,* 352 F. 2d 970 (CA8 1965) (except insofar as mail censorship rules are applied to discriminate against a particular racial or religious group); *Krupnick* v. *Crouse,* 366 F. 2d 851 (CA10 1966); *Pope* v. *Daggett,* 350 F. 2d 296 (CA10 1965). Another has required only that censorship of personal correspondence not lack support "in any rational and constitutionally acceptable concept of a prison system." *Sostre* v. *McGinnis,* 442 F. 2d 178, 199 (CA2 1971), cert. denied *sub nom. Oswald* v. *Sostre,* 405 U. S. 978 (1972). At the other extreme some courts have been willing to require demonstration of a "compelling state interest" to justify censorship of prisoner mail. *E. g., Jackson* v. *Godwin,* 400 F. 2d 529

---

[10] Specifically, the District Court held that the regulations authorized restraint of lawful expression in violation of the First and Fourteenth Amendments, that they were fatally vague, and that they failed to provide minimum procedural safeguards against arbitrary or erroneous censorship of protected speech.

(CA5 1968) (decided on both equal protection and First Amendment grounds); *Morales* v. *Schmidt*, 340 F. Supp. 544 (WD Wis. 1972); *Fortune Society* v. *McGinnis*, 319 F. Supp. 901 (SDNY 1970). Other courts phrase the standard in similarly demanding terms of "clear and present danger." *E. g.*, *Wilkinson* v. *Skinner*, 462 F. 2d 670, 672–673 (CA2 1972). And there are various intermediate positions, most notably the view that a "regulation or practice which restricts the right of free expression that a prisoner would have enjoyed if he had not been imprisoned must be related both reasonably and necessarily to the advancement of some justifiable purpose." *E. g.*, *Carothers* v. *Follette*, 314 F. Supp. 1014, 1024 (SDNY 1970) (citations omitted). See also *Gates* v. *Collier*, 349 F. Supp. 881, 896 (ND Miss. 1972); *LeMon* v. *Zelker*, 358 F. Supp. 554 (SDNY 1972).

This array of disparate approaches and the absence of any generally accepted standard for testing the constitutionality of prisoner mail censorship regulations disserve both the competing interests at stake. On the one hand, the First Amendment interests implicated by censorship of inmate correspondence are given only haphazard and inconsistent protection. On the other, the uncertainty of the constitutional standard makes it impossible for correctional officials to anticipate what is required of them and invites repetitive, piecemeal litigation on behalf of inmates. The result has been unnecessarily to perpetuate the involvement of the federal courts in affairs of prison administration. Our task is to formulate a standard of review for prisoner mail censorship that will be responsive to these concerns.

## B

We begin our analysis of the proper standard of review for constitutional challenges to censorship of prisoner mail with a somewhat different premise from that taken

by the other federal courts that have considered the question. For the most part, these courts have dealt with challenges to censorship of prisoner mail as involving broad questions of "prisoners' rights." This case is no exception. The District Court stated the issue in general terms as "the applicability of First Amendment rights to prison inmates . . . ," 354 F. Supp., at 1096, and the arguments of the parties reflect the assumption that the resolution of this case requires an assessment of the extent to which prisoners may claim First Amendment freedoms. In our view this inquiry is unnecessary. In determining the proper standard of review for prison restrictions on inmate correspondence, we have no occasion to consider the extent to which an individual's right to free speech survives incarceration, for a narrower basis of decision is at hand. In the case of direct personal correspondence between inmates and those who have a particularized interest in communicating with them,[11] mail censorship implicates more than the right of prisoners.

Communication by letter is not accomplished by the act of writing words on paper. Rather, it is effected only when the letter is read by the addressee. Both parties to the correspondence have an interest in securing that result, and censorship of the communication between them necessarily impinges on the interest of each. Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech. And this does not depend on whether the nonprisoner correspondent is the author or intended recipient of a particular letter, for the addressee as well as the sender of direct personal corre-

---

[11] Different considerations may come into play in the case of mass mailings. No such issue is raised on these facts, and we intimate no view as to its proper resolution.

spondence derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication. *Lamont* v. *Postmaster General*, 381 U. S. 301 (1965); accord, *Kleindienst* v. *Mandel*, 408 U. S. 753, 762–765 (1972); *Martin* v. *City of Struthers*, 319 U. S. 141, 143 (1943). We do not deal here with difficult questions of the so-called "right to hear" and third-party standing but with a particular means of communication in which the interests of both parties are inextricably meshed. The wife of a prison inmate who is not permitted to read all that her husband wanted to say to her has suffered an abridgment of her interest in communicating with him as plain as that which results from censorship of her letter to him. In either event, censorship of prisoner mail works a consequential restriction on the First and Fourteenth Amendments rights of those who are not prisoners.

Accordingly, we reject any attempt to justify censorship of inmate correspondence merely by reference to certain assumptions about the legal status of prisoners. Into this category of argument falls appellants' contention that "an inmate's rights with reference to social correspondence are something fundamentally different than those enjoyed by his free brother." Brief for Appellants 19. This line of argument and the undemanding standard of review it is intended to support fail to recognize that the First Amendment liberties of free citizens are implicated in censorship of prisoner mail. We therefore turn for guidance, not to cases involving questions of "prisoners' rights," but to decisions of this Court dealing with the general problem of incidental restrictions on First Amendment liberties imposed in furtherance of legitimate governmental activities.

As the Court noted in *Tinker* v. *Des Moines School District*, 393 U. S. 503, 506 (1969), First Amendment

guarantees must be "applied in light of the special characteristics of the . . . environment." *Tinker* concerned the interplay between the right to freedom of speech of public high school students and "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Id.*, at 507. In overruling a school regulation prohibiting the wearing of antiwar armbands, the Court undertook a careful analysis of the legitimate requirements of orderly school administration in order to ensure that the students were afforded maximum freedom of speech consistent with those requirements. The same approach was followed in *Healy* v. *James,* 408 U. S. 169 (1972), where the Court considered the refusal of a state college to grant official recognition to a group of students who wished to organize a local chapter of the Students for a Democratic Society (SDS), a national student organization noted for political activism and campus disruption. The Court found that neither the identification of the local student group with the national SDS, nor the purportedly dangerous political philosophy of the local group, nor the college administration's fear of future, unspecified disruptive activities by the students could justify the incursion on the right of free association. The Court also found, however, that this right could be limited if necessary to prevent campus disruption, *id.*, at 189–190, n. 20, and remanded the case for determination of whether the students had in fact refused to accept reasonable regulations governing student conduct.

In *United States* v. *O'Brien,* 391 U. S. 367 (1968), the Court dealt with incidental restrictions on free speech occasioned by the exercise of the governmental power to conscript men for military service. O'Brien had burned his Selective Service registration certificate on the steps

of a courthouse in order to dramatize his opposition to the draft and to our country's involvement in Vietnam. He was convicted of violating a provision of the Selective Service law that had recently been amended to prohibit knowing destruction or mutilation of registration certificates. O'Brien argued that the purpose and effect of the amendment were to abridge free expression and that the statutory provision was therefore unconstitutional, both as enacted and as applied to him. Although O'Brien's activity involved "conduct" rather than pure "speech," the Court did not define away the First Amendment concern, and neither did it rule that the presence of a communicative intent necessarily rendered O'Brien's actions immune to governmental regulation. Instead, it enunciated the following four-part test:

> "[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Id.*, at 377.

Of course, none of these precedents directly controls the instant case. In *O'Brien* the Court considered a federal statute which on its face prohibited certain conduct having no necessary connection with freedom of speech. This led the Court to differentiate between "speech" and "nonspeech" elements of a single course of conduct, a distinction that has little relevance here. Both *Tinker* and *Healy* concerned First and Fourteenth Amendment liberties in the context of state educational institutions, a circumstance involving rather different governmental interests than are at stake here. In broader terms, however, these precedents involved inci-

dental restrictions on First Amendment liberties by governmental action in furtherance of legitimate and substantial state interest other than suppression of expression. In this sense these cases are generally analogous to our present inquiry.

The case at hand arises in the context of prisons. One of the primary functions of government is the preservation of societal order through enforcement of the criminal law, and the maintenance of penal institutions is an essential part of that task. The identifiable governmental interests at stake in this task are the preservation of internal order and discipline,[12] the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners. While the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation,[13] the legitimate govern-

---

[12] We need not and do not address in this case the validity of a temporary prohibition of an inmate's personal correspondence as a disciplinary sanction (usually as part of the regimen of solitary confinement) for violation of prison rules.

[13] Policy Statement 7300.1A of the Federal Bureau of Prisons sets forth the Bureau's position regarding general correspondence by the prisoners entrusted to its custody: It authorizes all federal institutions to adopt open correspondence regulations and recognizes that any need for restrictions arises primarily from considerations of order and security rather than rehabilitation:

"Constructive, wholesome contact with the community is a valuable therapeutic tool in the overall correctional process. At the same time, basic controls need to be exercised in order to protect the security of the institution, individuals and/or the community-at-large."

The recommended policy guideline adopted by the Association of State Correctional Administrators on August 23, 1972, echoes the view that personal correspondence by prison inmates is a generally wholesome activity:

"Correspondence with members of an inmate's family, close friends, associates and organizations is beneficial to the morale of all confined

mental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate correspondence. Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape plans or containing other information concerning proposed criminal activity, whether within or without the prison. Similarly, prison officials may properly refuse to transmit encoded messages. Other less obvious possibilities come to mind, but it is not our purpose to survey the range of circumstances in which particular restrictions on prisoner mail might be warranted by the legitimate demands of prison administration as they exist from time to time in the various kinds of penal institutions found in this country. Our task is to determine the proper standard for deciding whether a particular regulation or practice relating to inmate correspondence constitutes an impermissible restraint of First Amendment liberties.

Applying the teachings of our prior decisions to the instant context, we hold that censorship of prisoner mail is justified if the following criteria are met. First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate corre-

---

persons and may form the basis for good adjustment in the institution and the community."

spondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.   This does not mean, of course, that. prison administrators may be required to show with certainty that adverse consequences would flow from the failure to censor a particular letter.   Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty. But any regulation or practice that restricts inmate correspondence must be generally necessary to protect one or more of the legitimate governmental interests identified above.[14]

---

[14] While not necessarily controlling, the policies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction.   For example, Policy Statement 7300.1A of the Federal Bureau of Prisons specifies that personal. correspondence of inmates in federal prisons, whether incoming or outgoing, may be rejected for inclusion of the following kinds of material:

"(1) Any material which might violate postal regulations, *i. e.*, threats, blackmail, contraband or which indicate plots of escape.

"(2) Discussions of criminal activities.

"(3) No inmate may be permitted to direct his business while he is in confinement.   This does not go to the point of prohibiting correspondence necessary to enable the inmate to protect the property and funds that were legitimately his at the time he was committed to the institution.   Thus, an inmate could correspond about refinancing a mortgage on his home or sign insurance papers, but he could not operate a mortgage or insurance business while in the institution.

"(4) Letters containing codes or other obvious attempts to circumvent these regulations will be subject to rejection.

"(5) Insofar as possible, all letters should be written in English, but every effort should be made to accommodate those inmates who are unable to write in English or whose correspondents would be unable to understand a letter written in English.   The criminal sophistication of the inmate, the relationship of the inmate and the

## C

On the basis of this standard, we affirm the judgment of the District Court. The regulations invalidated by that court authorized, *inter alia,* censorship of statements that "unduly complain" or "magnify grievances," expression of "inflammatory political, racial, religious or other views," and matter deemed "defamatory" or "otherwise inappropriate." These regulations fairly invited prison officials and employees to apply their own personal prejudices and opinions as standards for prisoner mail censorship. Not surprisingly, some prison officials used the extraordinary latitude for discretion authorized by the regulations to suppress unwelcome criticism. For example, at one institution under the Department's jurisdiction, the checklist used by the mailroom staff authorized rejection of letters "criticizing policy, rules or officials," and the mailroom sergeant stated in a deposition that he would reject as "defamatory" letters "belittling staff or our judicial system or anything connected with Department of Corrections." Correspondence was also censored for "disrespectful comments," "derogatory remarks," and the like.

Appellants have failed to show that these broad restrictions on prisoner mail were in any way necessary to the furtherance of a governmental interest unrelated to the suppression of expression. Indeed, the heart of appellants' position is not that the regulations are justified by a legitimate governmental interest but that they do not need to be. This misconception is not only stated affirmatively; it also underlies appellants' discussion of the particular regulations under attack. For example, appellants' sole defense of the prohibition against matter that is "defamatory" or "otherwise inappropriate" is that

correspondent are factors to be considered in deciding whether correspondence in a foreign language should be permitted."

it is "within the discretion of the prison administrators." Brief for Appellants 21. Appellants contend that statements that "magnify grievances" or "unduly complain" are censored "as a precaution against flash riots and in the furtherance of inmate rehabilitation." *Id.*, at 22. But they do not suggest how the magnification of grievances or undue complaining, which presumably occurs in outgoing letters, could possibly lead to flash riots, nor do they specify what contribution the suppression of complaints makes to the rehabilitation of criminals. And appellants defend the ban against "inflammatory political, racial, religious or other views" on the ground that "[s]uch matter clearly presents a danger to prison security . . . ." *Id.*, at 21. The regulation, however, is not narrowly drawn to reach only material that might be thought to encourage violence nor is its application limited to incoming letters. In short, the Department's regulations authorized censorship of prisoner mail far broader than any legitimate interest of penal administration demands and were properly found invalid by the District Court.[15]

[15] After the District Court held the original regulations unconstitutional, revised regulations were developed by appellants and approved by the court. Supp to App. 194–200, 211. Although these regulations are not before us for review, they are indicative of one solution to the problem. The following provisions govern censorship of prisoner correspondence:

"*CORRESPONDENCE*

"A. *Criteria for Disapproval of Inmate Mail*

"1. *Outgoing Letters*

"Outgoing letters from inmates of institutions not requiring approval of inmate correspondents may be disapproved for mailing only if the content falls as a whole or in significant part into any of the following categories:

"a. The letter contains threats of physical harm against any person or threats of criminal activity.

[*Footnote 15 is continued on p. 417*]

## D

We also agree with the District Court that the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards.

"b. The letter threatens blackmail . . . or extortion.

"c. The letter concerns sending contraband in or out of the institutions.

"d. The letter concerns plans to escape.

"e. The letter concerns plans for activities in violation of institutional rules.

"f. The letter. concerns plans for criminal activity.

"g. The letter is in code and its contents are not understood by reader.

"h. The letter solicits gifts of goods or money from other than family.

"i. The letter is obscene.

"j. The letter contains information which if communicated would create a clear and present danger of violence and physical harm to a human being. Outgoing letters from inmates of institutions requiring approval of correspondents may be disapproved only for the foregoing reasons, or if the addressee is not an approved correspondent of the inmate and special permission for the letter has not been obtained.

"2. *Incoming Letters*

"Incoming letters to inmates may be disapproved for receipt only for the foregoing reasons, or if the letter contains material which would cause severe psychiatric or emotional disturbance to the inmate, or in an institution requiring approval of inmate correspondents, is from a person who is not an approved correspondent and special permission for the letter has not been obtained.

"3. *Limitations*

"Disapproval of a letter on the basis that it would cause severe psychiatric or emotional disturbance to the inmate may be done only by a member of the institution's psychiatric staff after consultation with the inmate's caseworker. The staff member may disapprove the letter only upon a finding that receipt of the letter would be likely to affect prison discipline or security or the inmate's rehabilitation, and that there is no reasonable alternative means of ameliorating the disturbance of the inmate. Outgoing or incoming letters

The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a "liberty" interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of imprisonment. As such, it-is protected from arbitrary governmental invasion. See *Board of Regents* v. *Roth,* 408 U. S. 564 (1972); *Perry* v. *Sindermann,* 408 U. S. 593 (1972). The District Court required that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than

---

may not be rejected solely upon the ground that they contain criticism of the institution or its personnel.

"4. *Notice of Disapproval of Inmate Mail*

"a. When an inmate is *prohibited from sending* a letter, the letter and a written and signed notice stating one of the authorized reasons for disapproval and indicating the portion or portions of the letter causing disapproval will be given the inmate.

"b. When an inmate is *prohibited from receiving* a letter, the letter and a written and signed notice stating one of the authorized reasons for disapproval and indicating the portion or portions of the letter causing disapproval will be given the sender. The inmate will be given notice in writing that a letter has been rejected, indicating one of the authorized reasons and the sender's name.

"c. Material from correspondence which violates the provisions of paragraph one may be placed in an inmate's file. Other material from correspondence may not be placed in an inmate's file unless it has been lawfully observed by an employee of the department and is relevant to assessment of the inmate's rehabilitation. However, such material which is not in violation of the provisions of paragraph one may not be the subject of disciplinary proceedings against an inmate. An inmate shall be notified in writing of the placing of any material from correspondence in his file.

"d. Administrative review of inmate grievances regarding the application of this rule may be had in accordance with paragraph DP–1003 of these rules."

the person who originally disapproved the correspondence. These requirements do not appear to be unduly burdensome, nor do appellants so contend. Accordingly, we affirm the judgment of the District Court with respect to the Department's regulations relating to prisoner mail.

## II

The District Court also enjoined continued enforcement of Administrative Rule MV–IV–02, which provides in pertinent part:

> "Investigators for an attorney-of-record will be confined to not more than two. Such investigators must be licensed by the State or must be members of the State Bar. Designation must be made in writing by the Attorney."

By restricting access to prisoners to members of the bar and licensed private investigators, this regulation imposed an absolute ban on the use by attorneys of law students and legal paraprofessionals to interview inmate clients. In fact, attorneys could not even delegate to such persons the task of obtaining prisoners' signatures on legal documents. The District Court reasoned that this rule constituted an unjustifiable restriction on the right of access to the courts. We agree.

The constitutional guarantee of due process of law has as a corollary the requirement that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights. This means that inmates must have a reasonable opportunity to seek and receive the assistance of attorneys. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid. *Ex parte Hull,* 312 U. S. 546 (1941).

The District Court found that the rule restricting attorney-client interviews to members of the bar and licensed private investigators inhibited adequate professional representation of indigent inmates. The remoteness of many California penal institutions makes a personal visit to an inmate client a time-consuming undertaking. The court reasoned that the ban against the use of law students or other paraprofessionals for attorney-client interviews would deter some lawyers from representing prisoners who could not afford to pay for their traveling time or that of licensed private investigators. And those lawyers who agreed to do so would waste time that might be employed more efficaciously in working on the inmates' legal problems. Allowing law students and paraprofessionals to interview inmates might well reduce the cost of legal representation for prisoners. The District Court therefore concluded that the regulation imposed a substantial burden on the right of access to the courts.

As the District Court recognized, this conclusion does not end the inquiry, for prison administrators are not required to adopt every proposal that may be thought to facilitate prisoner access to the courts. The extent to which that right is burdened by a particular regulation or practice must be weighed against the legitimate interests of penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials. In this case the ban against the use of law students and other paraprofessional personnel was absolute. Its prohibition was not limited to prospective interviewers who posed some colorable threat to security or to those inmates thought to be especially dangerous. Nor was it shown that a less restrictive regulation would unduly burden the administrative task of screening and monitoring visitors.

Appellants' enforcement of the regulation in question also created an arbitrary distinction between law students employed by practicing attorneys. and those associated with law school programs providing legal assistance to prisoners.[16] While the Department flatly prohibited interviews of any sort by law students working for attorneys, it freely allowed participants of a number of law school programs to enter the prisons and meet with inmates. These largely unsupervised students were admitted without any security check other than verification of their enrollment in a school program. Of course, the fact that appellants have allowed some persons to conduct attorney-client interviews with prisoners does not mean that they are required to admit others, but the arbitrariness of the distinction between the two categories of law students does reveal the absence of any real justification for the sweeping prohibition of Administrative Rule MV–IV–02. We cannot say that the District Court erred in invalidating this regulation.

This result is mandated by our decision in *Johnson v. Avery*, 393 U. S. 483 (1969). There the Court struck down a prison regulation prohibiting any inmate from advising or assisting another in the preparation of legal documents. Given the inadequacy of alternative sources of legal assistance, the rule had the effect of denying to illiterate or poorly educated inmates any opportunity to vindicate possibly valid constitutional claims. The Court found that the regulation impermissibly burdened the right of access to the courts despite the not insignificant state interest in preventing the establishment of personal power structures by unscrupulous jailhouse lawyers and the attendant problems of prison discipline that

---

[16] Apparently, the Department's policy regarding law school programs providing legal assistance to inmates, though well established, is not embodied in any regulation.

follow. The countervailing state interest in *Johnson* is, if anything, more persuasive than any interest advanced by appellants in the instant case.

The judgment is

*Affirmed.*

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, concurring.

I

I concur in the opinion and judgment of the Court. I write separately only to emphasize my view that prison authorities do not have a general right to open and read all incoming and outgoing prisoner mail. Although the issue of the First Amendment rights of inmates is explicitly reserved by the Court, I would reach that issue and hold that prison authorities may not read inmate mail as a matter of course.

II

As Mr. Justice Holmes observed over a half century ago, "the use of the mails is almost as much a part of free speech as the right to use our tongues . . . ." *Milwaukee Social Democratic Publishing Co.* v. *Burleson*, 255 U. S. 407, 437 (1921) (dissenting opinion), quoted with approval in *Blount* v. *Rizzi*, 400 U. S. 410, 416 (1971). See also *Lamont* v. *Postmaster General*, 381 U. S. 301, 305 (1965). A prisoner does not shed such basic First. Amendment rights at the prison gate.[1] Rather, he "retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from

---

[1] See, *e. g., Cruz* v. *Beto*, 405 U. S. 319 (1972); *Cooper* v. *Pate*, 378 U. S. 546 (1964); *Brown* v. *Peyton*, 437 F. 2d 1228, 1230 (CA4 1971); *Rowland* v. *Sigler*, 327 F. Supp. 821, 827 (Neb.), aff'd, 452 F. 2d 1005 (CA8 1971); *Fortune Society* v. *McGinnis*, 319 F. Supp. 901, 903 (SDNY 1970).

him by law." *Coffin* v. *Reichard,* 143 F. 2d 443, 445 (CA6 1944).[2] Accordingly, prisoners are, in my view, entitled to use the mails as a medium of free expression not as a privilege, but rather as a constitutionally guaranteed right.[3]

It seems clear that this freedom may be seriously infringed by permitting correctional authorities to read all prisoner correspondence. A prisoner's free and open expression will surely be restrained by the knowledge that his every word may be read by his jailors and that his message could well find its way into a disciplinary file, be the object of ridicule, or even lead to reprisals. A similar pall may be cast over the free expression of the inmates' correspondents. Cf. *Talley* v. *California,* 362 U. S. 60, 65 (1960); *NAACP* v. *Alabama,* 357 U. S. 449, 462 (1958). Such an intrusion on First Amendment freedoms can only be justified by a substantial government interest and a showing that the means chosen to effectuate the State's purpose are not unnecessarily restrictive of personal freedoms.

> "[E]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more

---

[2] Accord, *Moore* v. *Ciccone,* 459 F. 2d 574, 576 (CA8 1972); *Nolan* v. *Fitzpatrick,* 451 F. 2d 545, 547 (CA1 1971); *Brenneman* v. *Madigan,* 343 F. Supp. 128, 131 (ND Cal. 1972); *Burnham* v. *Oswald,* 342 F. Supp. 880, 884 (WDNY 1972); *Carothers* v. *Follette,* 314 F. Supp. 1014, 1023 (SDNY 1970).

[3] See, *e. g., Sostre* v. *McGinnis,* 442 F. 2d 178, 199 (CA2 1971) (en banc); *Preston* v. *Thieszen,* 341 F. Supp. 785, 786–787 (WD Wis. 1972); cf. *Gray* v. *Creamer,* 465 F. 2d 179, 186 (CA3 1972); *Morales* v. *Schmidt,* 340 F. Supp. 544 (WD Wis. 1972); *Palmigiano* v. *Travisono,* 317 F. Supp. 776 (RI 1970); *Carothers* v. *Follette, supra.*

narrowly achieved." *Shelton v. Tucker,* 364 U. S. 479 488 (1960).[4]

The First Amendment must in each context "be applied 'in light of the special characteristics of the . . . environment,' " *Healy* v. *James,* 408 U. S. 169, 180 (1972), and the exigencies of governing persons in prisons are different from and greater than those in governing persons without. *Barnett* v. *Rodgers,* 133 U. S. App. D. C. 296, 301–302, 410 F. 2d 995, 1000–1001 (1969); *Rowland* v. *Sigler,* 327 F. Supp. 821, 827 (Neb.), aff'd, 452 F. 2d 1005 (CA8 1971). The State has legitimate and substantial concerns as to security, personal safety, institutional discipline, and prisoner rehabilitation not applicable to the community at large. But these considerations do not eliminate the need for reasons imperatively justifying the particular deprivation of fundamental constitutional rights at issue. Cf. *Healy* v. *James, supra,* at 180; *Tinker* v. *Des Moines School District,* 393 U. S. 503, 506 (1969).

The State asserts a number of justifications for a general right to read all prisoner correspondence. The State argues that contraband weapons or narcotics may be smuggled into the prison via the mail, and certainly this is a legitimate concern of prison authorities. But this argument provides no justification for reading outgoing mail. Even as to incoming mail, there is no showing that stemming the traffic in contraband could not be accomplished equally well by means of physical tests

---

[4] The test I would apply is thus essentially the same as the test applied by the Court:

"[T]he regulation . . . in question must further an important or substantial governmental interest unrelated to the suppression of expression . . . [and] the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Ante,* at 413.

such as fluoroscoping letters.[5] If physical tests were inadequate, merely opening and inspecting—and not reading—incoming mail would clearly suffice.[6]

It is also suggested that prison authorities must read all prison mail in order to detect escape plans. The State surely could not justify reading everyone's mail and listening to all phone conversations on the off chance that criminal schemes were being concocted. Similarly, the reading of all prisoner mail is too great an intrusion on First Amendment rights to be justified by such a speculative concern. There has been no showing as to the seriousness of the problem of escapes planned or arranged via the mail. Indeed, the State's claim of concern over this problem is undermined by the general practice of permitting unmonitored personal interviews during which any number of surreptitious plans might be discussed undetected.[7] When prison authorities have reason to believe that an escape plot is being hatched by a particular inmate through his correspondence, they may well have an adequate basis to seize that inmate's letters; but there is no such justification for a blanket policy of reading all prison mail.

It is also occasionally asserted that reading prisoner mail is a useful tool in the rehabilitative process. The therapeutic model of corrections has come under increasing criticism and in most penal institutions rehabilitative programs are more ideal than reality.[8] Assuming the validity of the rehabilitative model, however, the State does not demonstrate that the reading of inmate

[5] See *Marsh* v. *Moore*, 325 F. Supp. 392, 395 (Mass. 1971).

[6] See *Moore* v. *Ciccone, supra*, at 578 (Lay, J., concurring); cf. *Jones* v. *Wittenberg*, 330 F. Supp. 707, 719 (ND Ohio 1971), aff'd *sub nom. Jones* v. *Metzger*, 456 F. 2d 854 (CA6 1972).

[7] *Palmigiano* v. *Travisono, supra.*

[8] See generally J. Mitford, Kind and Usual Punishment: The Prison Business (1973).

mail, with its attendant chilling effect on free expression, serves any valid rehabilitative purpose. Prison walls serve not merely to restrain offenders but also to isolate them. The mails provide one of the few ties inmates retain to their communities or families—ties essential to the success of their later return to the outside world.[9] Judge Kaufman, writing for the Second Circuit, found two observations particularly apropos of similar claims of rehabilitative benefit in *Sostre* v. *McGinnis*, 442 F. 2d 178, 199 (1971) (en banc):

> " 'Letter writing keeps the inmate in contact with the outside world, helps to hold in check some of the morbidity and hopelessness produced by prison life and isolation, stimulates his more natural and human impulses, and otherwise may make contributions to better mental attitudes and reformation.' "[10]

and:

> " 'The harm censorship does to rehabilitation . . . cannot be gainsaid. Inmates lose contact with the outside world and become wary of placing intimate thoughts or criticisms of the prison in letters. This artificial increase of alienation from society is ill advised.' "[11]

The Court today agrees that "the weight of professional opinion seems to be that inmate freedom to correspond with outsiders advances rather than retards the goal of rehabilitation." *Ante,* at 412.[12]

---

[9] See, *e. g.,* National Advisory Commission on Criminal Justice Standards and Goals, Corrections 67–68 (1973).

[10] See *Palmigiano* v. *Travisono, supra,* at 791.

[11] Singer, Censorship of Prisoners' Mail and the Constitution, 56 A. B. A. J. 1051, 1054 (1970).

[12] Various studies have strongly recommended that correctional authorities have the right to inspect mail for contraband but not to read it. National Advisory Commission on Criminal Justice Stand-

Balanced against the State's asserted interests are the values that are generally associated with freedom of speech in a free society—values which "do not turn to dross in an unfree one." *Sostre* v. *McGinnis, supra,* at 199. First Amendment guarantees protect the free and uninterrupted interchange of ideas upon which a democratic society thrives. Perhaps the most obvious victim of the indirect censorship effected by a policy of allowing prison authorities to read inmate mail is criticism of prison administration. The threat of identification and reprisal inherent in allowing correctional authorities to read prisoner mail is not lost on inmates who might otherwise criticize their jailors. The mails are one of the few vehicles prisoners have for informing the community about their existence and, in these days of strife in our correctional institutions, the plight of prisoners is a matter of urgent public concern. To sustain a policy which chills the communication necessary to inform the public on this issue is at odds with the most basic tenets of the guarantee of freedom of speech.[13]

The First Amendment serves not only the needs of the polity but also those of the human spirit—a spirit that demands self-expression. Such expression is an integral part of the development of ideas and a sense of identity. To suppress expression is to reject the basic human desire for recognition and affront the individual's worth and dignity.[14] Cf. *Stanley* v. *Georgia,* 394 U. S.

---

ards and Goals, Corrections, Standard 2.17, pp. 66–69 (1973); see California Board of Corrections, California Correctional System Study: Institutions 40 (1971); Center for Criminal Justice, Boston University Law School, Model Rules and Regulations on Prisoners' Rights and Responsibilities, Standards IC–1 and IC–2, pp. 46–47 (1973).

[13] See, *e. g., Nolan* v. *Fitzpatrick,* 451 F. 2d, at 547–548.

[14] Emerson, Toward a General Theory of the First Amendment, 72 Yale L. J. 877, 879–880 (1963).

557 (1969). Such restraint may be "the greatest displeasure and indignity to a free and knowing spirit that can be put upon him." J. Milton, Aeropagitica 21 (Everyman's ed. 1927). When the prison gates slam behind an inmate, he does not lose his human quality; his mind does not become closed to ideas; his intellect does not cease to feed on a free and open interchange of opinions; his yearning for self-respect does not end; nor is his quest for self-realization concluded. If anything, the needs for identity and self-respect are more compelling in the dehumanizing prison environment. Whether an O. Henry writing his short stories in a jail cell or a frightened young inmate writing his family, a prisoner needs a medium for self-expression. It is the role of the First Amendment and this Court to protect those precious personal rights by which we satisfy such basic yearnings of the human spirit.

Mr. Justice Douglas joins in Part II of this opinion.

Mr. Justice Douglas, concurring in the judgment.

I have joined Part II of Mr. Justice Marshall's opinion because I think it makes abundantly clear that foremost among the Bill of Rights of prisoners in this country, whether under state or federal detention, is the First Amendment. Prisoners are still "persons" entitled to all constitutional rights unless their liberty has been constitutionally curtailed by procedures that satisfy all of the requirements of due process.

While Mr. Chief Justice Hughes in *Stromberg* v. *California*, 283 U. S. 359, stated that the First Amendment was applicable to the States by reason of the Due Process Clause of the Fourteenth, it has become customary to

rest on the broader foundation of the entire Fourteenth Amendment. Free speech and press within the meaning of the First Amendment are, in my judgment, among the pre-eminent privileges and immunities of all citizens.