Rick REED, Ralph Goldberg, Southern Prisoners Defense Committee, American Civil Liberties Union, Georgia Clearinghouse on Prisons and Jails, and Gary Krist, Ron Streeter, John Lucear, Dwight Lindsey, and James Watson, Plaintiffs,

v.

David EVANS, Commissioner of the Department of Offender Rehabilitation, and Joe Hopper, Warden of Georgia State Prison, Individually and in their official capacities, Defendants.

No. CV478-160.

United States District Court, S. D. Georgia, Savannah Division.

Aug. 17, 1978.

Thomas M. West, Bowen, Derrickson, Goldberg & West, Atlanta, Ga., for plaintiffs.

Arthur K. Bolton, Atty. Gen., Atlanta, Ga., Griffin B. Bell, Jr., Asst. Atty. Gen., Savannah, Ga., for defendants.

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

LAWRENCE, District Judge.

This action is brought to require the defendants to admit a "paralegal" to the Georgia State Prison at Reidsville for the purpose of interviewing prisoner clients of an attorney. Plaintiffs sought a temporary restraining order which was, in effect, a mandatory injunction. The TRO was denied by this Court on July 3, 1978. An evidentiary hearing at Savannah was held on the rule to show cause order on July 14, 1978.

I

The issue in this case is whether or not the refusal to give plaintiff access to the inmates was justified under the Rules and underlying facts.

The genesis of this action is a separate action now pending in this district, namely, *Krist, et al. v. Hopper and Evans,* CV478-167. Five prisoners at Reidsville who are plaintiffs here (Krist, Streeter, Lucear, Lindsey, and Watson) filed a petition for a

writ of habeas corpus and for injunctive relief under 42 U.S.C. § 1983 in the Northern District. They seek release from the maximum security section at the prison. Prison officials, it is alleged, denied them due process by placing them in the segregation unit without notice of the charges or prior opportunity to be heard. In response, the prison officials assert that the prisoners were placed in administrative segregation following the burning of the prison chapel on Sunday, April 23, 1978.[1]

The State's attorneys objected to venue in the Northern District. On July 10th, because of lack of venue, the Court transferred the case to the Southern District of Georgia.

On July 28th Chief Judge Alaimo ordered defendants to show cause in the habeas case on August 14, 1978, why the prisoners should not be released from segregation. The hearing was postponed.

## II

The present action is based on the charge that, in violation of 42 U.S.C. § 1983, the prison officials have refused to allow Rick Reed to interview the five prisoners relative to their pending habeas corpus action. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202. Jurisdiction is predicated on 28 U.S.C. §§ 1343, 1361.

It is claimed that the refusal by defendants to allow Mr. Reed to interview the prisoners deprives him as well as Ralph Goldberg, an attorney for the five inmates, of the right to pursue their livelihood. It contends also that such refusal unjustifiably restricts the prisoners' access to the courts.

The complaint alleges that Mr. Reed is director of the Georgia Clearinghouse on Prisons and Jails. He interviews prisoners "to determine if they have a problem requiring remedial action by the Courts" and also potential witnesses. He responds to prisoner mail.

Mr. Ralph Goldberg is an attorney for the Southern Prisoners Defense Committee, the litigation branch of the Southern Coalition on Prisons and Jails. The Georgia Clearinghouse on Prisons and Jails is the Georgia arm of the Southern Coalition and an affiliate of the American Civil Liberties Union.

## III

An evidentiary hearing was held in this Court on July 14th at which Reed, Goldberg, Hopper and a paralegal testified.

The sequence of events involved here begins on Sunday, March 26, 1978. On that day, Mr. Reed signed in at Georgia State Prison on the Daily Record of Visits at 9:15 A.M. The entry by his name indicates that he was representing the World Congress of Islam in the West ("W.C.I.W."). Two other persons, A. J. Sabree and Anwar F. Sadat, are apparently ministers of the W.C.I.W. and had signed in prior to Mr. Reed as representatives of that organization. After the initial entry by A. J. Sabree, the information as to Sadat and Reed was indicated by ditto marks. Each individual apparently signed his own name. (Def. Ex. 2).

The three men indicated that they were going to the prison chapel. They did. They left the facility together at 11:31 A.M.

Between 11:30 and noon on the same day inmates in the chapel and on the prison yard created a disturbance. Armed prison guards were posted on the walls around the area. At some point the same day, Warden Hopper received a telephone call from the Inmate Unity Committee. It had been formed the same day. According to Warden Hopper, the speaker threatened to burn down the prison unless he agreed to meet with the Committee.

Warden Hopper met that afternoon with the newly-formed group. It included the five prisoners who are parties in this case. He issued a memorandum dated the same

---

1. According to the Rules of the State Board of Corrections, a prisoner may be placed in administrative segregation "to maintain order at the institution; to protect either the individual inmate or other members of the inmate population or members of the institutional staff; or for detention pending completion of an investigation of charges against him." 125–2–4.03.

day to all inmates, in which the Committee was recognized and he stated that it would be "working directly with me to promote racial harmony and the elimination of violence at Georgia State Prison." (Pl. Ex. 7).

The next series of events concerns the efforts of Reed to gain access to the prison in order to interview the inmates who brought the habeas action in the Northern District of Georgia.

Warden Hopper testified that Mr. Reed called him on April 14, 1978. He allegedly represented that he was an attorney and asked to interview certain prisoners. Mr. Hopper gave him permission. Reed testified that he informed the Warden that he was a representative of the American Civil Liberties Union, Clearinghouse on Prisons and Jails; that he worked in conjunction with attorney Ralph Goldberg, and that he wished to talk with five inmates in respect to representing them. During his cross-examination of the Warden, counsel for plaintiffs endeavored to establish that Hopper misunderstood Reed's representation as to being an attorney.

On April 19th Messrs. Reed and Goldberg went to the Reidsville prison to interview the inmates. Reed was denied admission because he did not have a State Bar card. Def. Ex. 3. He testified at the hearing that Warden Hopper had left instructions that he not be admitted. Mr. Hopper said that he refused Reed admittance because he was not an attorney and because he had not complied with the procedure for the admittance to the prison as to the status of paralegals.

On April 23, 1978, the prison chapel was burned. The five prisoners involved here were placed in segregation pending investigation into the cause of the fire. Placing the group in administrative segregation precipitated the filing of petition for writ of habeas corpus in the Northern District.

An exchange of letters between Goldberg and Hopper ensued in regard to the denial of access by Reed. The attorney wrote on April 26th, protesting the refusal to admit him to the prison. (Pl. Ex. 1). Mr. Goldberg identified him as his "paralegal on prisoner matters."[2] Warden Hopper responded on May 2nd, explaining that Reed had represented himself as an attorney and that Reed had failed to follow the procedure applicable to paralegals. Mr. Hopper stated that "you must provide me with sufficient documentation that will show Mr. Reed is gainfully employed by you as a paralegal. When this particular prerequisite is met then Mr. Reed should encounter no difficulty in accompanying you while visiting this institution and your clients." (Pl. Ex. 2). In response to this letter, Mr. Goldberg stated that it is "Mr. Reed's duty to investigate complaints and possible legal actions as to any prisoner in the Georgia system." (Pl. Ex. 3). This did not satisfy the requirements of the Warden. He indicated in reply that he would not be admitted as a paralegal. (Pl. Ex. 4).

Warden Hopper testified that he read in a newspaper that Reed had visited the prison on March 26th. Because the disturbance in the chapel occurred immediately after he and the ministers left the building, he suspected that he had enflamed the prisoners. Nothing in the evidence supports any such connection other than surmise and coincidence.

## IV

The Rules of the State Board of Corrections provide that "By prior arrangement with the warden, the inmate may be visited by a para-legal, investigator, or law assistant employed by an 'attorney.'" Counsel for both sides have quoted Advisory Opinion Number 21 of the *Georgia State Bar News*, May, 1978. It defines a paralegal as one "who renders services relating to the law to such member, partnership or professional corporation under the direct control, supervision and compensation of a member of the State Bar of Georgia."[3]

---

**2.** Mr. Reed testified that he had not specifically worked under the direction of an attorney but that he researches legal questions for prisoners. He has had no formal paralegal training.

**3.** Considerable recent literature exists on the subject of "paralegals." The articles are listed in *Index to Legal Periodicals*, Cumm. 17 and subsequent quarterly issues. The list includes:

One of Warden Hopper's objections to Reed's access to the prison was that he was not employed by Attorney Goldberg. Plaintiffs argue that there is no rational basis for such a requirement since Messrs. Goldberg and West, plaintiffs' counsel, had agreed to assume "professional responsibility" for Mr. Reed's actions.

Clearly, Reed is not employed by Goldberg in any capacity. The fact is that Mr. Goldberg is employed or retained by Southern Prisoners Defense Committee which is an affiliate of Georgia Clearinghouse on Prisons and Jails of which Reed is Director. Apparently both are financed by A.C.L.U.

There is nothing in the record to indicate that Mr. Reed could not obtain official permission to interview inmates during normal visiting hours if it is requested. As an attorney, Mr. Goldberg has access to his clients. He testified, however, that it is highly inconvenient for him to make the two hundred mile trip to Reidsville to interview them. He says that he is retained by the Defense Committee for a limited number of hours each month and that the trip to Reidsville to interview prisoner-clients consumes too much of his restricted time. Counsel urges that the failure to permit Reed to conduct these interviews interferes with his right to pursue his profession and unduly restricts his clients' access to the courts.

## V

The four requisites to the granting of a preliminary injunction are "(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest." See *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir.).

Bailey & Kleeman, "Paralegal Functions and Legal Constraints," 9 *Clearinghouse Review* 851; Statsky, "Techniques for Supervising Pa-

"[I]nmates must have a reasonable opportunity to seek and receive the assistance of attorneys. Regulations and practices that unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts are invalid." *Procunier v. Martinez*, 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224. In that case, the Supreme Court ruled that an "absolute ban" upon the use of law students or paraprofessionals to interview inmate clients was "an unjustifiable restriction on the right of access to the courts." 416 U.S. at 419, 94 S.Ct. at 1814. That situation, however, differs from the one here in that access is denied only to those reasonably believed to represent a threat to prison security, or for some other valid reason. See, e. g., *Shakur v. Malcolm*, 525 F.2d 1144, 1147 (2nd Cir.). In *Procunier* the Supreme Court stated that the right to access to the courts must be balanced with "the legitimate interests to penal administration and the proper regard that judges should give to the expertise and discretionary authority of correctional officials." 416 U.S. at 420, 94 S.Ct. at 1815.

As indicated earlier, a paralegal may interview inmates at the State Prison if he makes prior arrangements and if he is "employed" by the attorney desiring his assistance. Under the Rules of the Board of Corrections the warden may, however, refuse to admit a paralegal for "cause," i. e., "any misrepresentation, made . . . concerning the visit" or "reason to believe the visit would pose a threat to institutional security." § 125–2—10.07(2).

## VI

Plaintiffs have failed to carry the burden of establishing the requisites to the grant of a preliminary injunction. The Prison's requirement that the paralegal be employed by an attorney is not an unjustifiable restriction on the right of access to the

ralegals," 22 *Practical Lawyer* 81; Alhadeff, "Legal Assistants," 51 *Florida Bar Journal* 592.

courts. The State Bar Advisory opinion says that a paralegal is one who is supervised and compensated by an attorney. Reed does not so qualify. In his conversation with Warden Hopper last April he represented that he was an attorney. He passively misrepresented his status when he gained entrance as a purported representative of the World Congress of Islam in the West. Whether the Warden's belief is justified or not, the disturbance in the prison chapel on March 26, 1978, could create in a prison official's mind a reasonable belief that Mr. Reed's presence could pose a threat to prison security.

Considerations of maintenance of proper security at the prison for which the prison officials are responsible far outweigh the claims advanced by plaintiffs concerning denial of access to counsel and deprivation of counsel's right to practice his profession. I will add that travel inconvenience of an attorney does not reach, in my opinion, the level of infringement of a constitutional right.

Plaintiffs' motion for a preliminary injunction is denied.

The foregoing Opinion is deemed sufficient compliance with Rule 52.