F I L E D
United States Court of Appeals
Tenth Circuit

APR 12 1999

PATRICK FISHER
Clerk

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STEPHEN ALLEN STEWART,

      Plaintiff-Appellee,

v.

DON THOMAS, RONALD DOW,
WILLIAM L. CUMMINGS,

      Defendants-Appellants.

No. 98-3236

(D.C. 97-3200-KHV)
(District of Kansas)

---

**ORDER AND JUDGMENT** *

---

Before **SEYMOUR** , Chief Judge, **BALDOCK** , and **HENRY** , Circuit Judges.

---

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App.P.34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

    *     This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

1

Plaintiff Stephen Allen Stewart, a state prisoner, appeals the district court's grant of summary judgment in favor of defendants, Don Thomas, Ronald Dow, and William L. Cummings on his claim under 42 U.S.C. §1983. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm district court's grant of summary judgment.

## BACKGROUND

Mr. Stewart is an inmate in the El Dorado Correction Facility, a prison operated by the Kansas Department of Corrections. He challenges Internal Management Policy and Procedure 10-110 ("IMPP 10-110"), a prison policy requiring inmates to be officially registered in a particular faith for three months before being allowed to receive special benefits associated with the religion. As a result of the policy, Mr. Stewart was denied special meals served after sunset in observance of Ramadan in 1997.

During the Islamic month of Ramadan, Muslims fast from dawn to sunset every day. This disciplined fasting usually requires no consumption of food or drink, including water, during daylight hours. Ramadan is important in the Muslim faith because it is the month in which the first verses of the Holy Qur'an (often spelled "Koran" in English) were revealed by Allah to the Prophet Muhammad. Inmates who participate in Ramadan receive a sack meal after

2

sunset but are required to attend work and other activities on the regular prison schedule.

IMPP 10-110 was enacted in response to a 1994 survey conducted by the Kansas Department of Corrections on the issue of accommodating inmates' religious needs. The survey revealed a problem involving attempts by inmates to participate in the activities of other religious faiths. Inmates would suddenly declare themselves to be a member of a particular religious faith for the purpose of attending a banquet or feast, for example, or would claim a right to have a particular day off from work assignments as a religious holy day. This had the effect of creating confusion and uncertainty for facility chaplains and security staff. Moreover, the survey revealed that the sudden switching engendered resentment on the part of regular practitioners of the faiths involved toward the inmates who had suddenly declared an interest in the faith, apparently only to reap a particular benefit. As a result, inmates who wish to become eligible to receive special benefits associated with a particular religion, but who are not listed as a member of that religion in prison records, must submit a change of religion form and practice the religion for ninety days before becoming eligible to receive the special benefits.

In 1977, when he was first admitted into the custody of the Kansas Department of Corrections, Mr. Stewart declared himself a Protestant. In 1979,

Mr. Stewart became an Orthodox American Muslim. However, his files were never changed and continued to reflect that he was a Protestant. In January 1995, before IMPP 10-110 was enacted, Mr. Stewart was put on the list of inmates observing Ramadan and received the special Ramadan meals served after sunset. In January 1996, after the policy was enacted, Mr. Stewart again was put on the list and received the special Ramadan meals. Defendants admit in their brief that it was a mistake to place Mr. Stewart on the list to receive the special Ramadan meals and that had prison officials realized his central file indicated he was Protestant, he would not have been placed on the list in January 1996.

On December 30, 1996, Chaplain Dow sent a memorandum to all inmates. The memorandum, which was approved by Deputy Warden Don Thomas, required all inmates who wished to observe Ramadan to submit a "Form 9" request "chit" by January 6, 1997. The memorandum also stated that participation was limited to "those whose central files identify them as Islamic or Moorish Science Temple." Rec. doc. 15, Ex. A. Inmates who wished to change their religion to Islamic or Moorish Science Temple were instructed to follow the procedures set forth in IMPP 10-110.

On January 2, 1997, Mr. Stewart submitted his "Form 9" request to be placed on the list of prisoners to receive the special Ramadan meals. On January 7, 1997, Chaplain Dow denied plaintiff's request because his official record

4

showed his religion as Protestant. Mr. Stewart was apparently reluctant to submit a change of religion form. Consequently, even though pork – a meat usually prohibited by the Orothodox Islamic faith – was taken off the facility's menu in 1996, Chaplain Dow denied Mr. Stewart's request for a non-pork diet in order to encourage him to change his central data sheet. On January 12, 1997, Mr. Stewart submitted a second "Form 9"request stating that the information in his official record was twenty years old and incorrect.

On January 29, 1997, Mr. Stewart filed a grievance with the Unit Team, complaining of Chaplain Dow's decision to deny him the opportunity to participate in Ramadan. The Unit Team responded on March 10, 1997, stating that the requirements for participation in Ramadan were more strict this year and that Mr. Stewart's name had been left off the list because his official records indicated that he was Protestant. The Team further stated that Mr. Stewart could correct the situation by submitting a change of religion form to Chaplain Dow. Although the process normally takes ninety days, Chaplain Dow agreed to waive this requirement and approve the change as soon as he received the form.

On March 12, 1997, Mr. Stewart finally submitted a change of religion form. His data sheet was changed to reflect his religion as Muslim, Chaplain Dow waived the ninety day requirement, and prison officials placed Mr. Stewart on the list for the Ramadan feast in May.

Mr. Stewart filed a §1983 action against Chaplain Dow, Don Thomas (the deputy warden of the El Dorado Correctional Facility), and William Cummings (the Deputy Secretary of the Kansas Department of Corrections). He alleged that the defendants violated his right to free exercise of religion by enforcing IMPP 10-110. The district court read Mr. Stewart's complaint to also assert an Eighth Amendment claim for deliberate indifference to his dietary needs. The court granted summary judgment to the defendants on both claims.

**DISCUSSION**

Because Mr. Stewart appears pro se, we construe his pleadings liberally. See Shabazz v. Askins , 14 F.3d 533, 535 (10th Cir.1994). We review a grant of summary judgment de novo, applying the same standard as the district court. See id. Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Although the court considers all evidence in a light most favorable to the nonmoving party, the nonmoving party may not rely on unsupported, conclusory allegations. See Shabazz , 14 F.3d at 535.

Mr. Stewart's appellate brief challenges the prison's change of religion policy on two grounds: (1) that the policy is unconstitutional on its face; and (2) that the policy was unconstitutional as applied to him to deny him special

Ramadan meals in 1997. Mr. Stewart also argues that the district court improperly granted certain extensions of time to the defendant prison officials.

### A. Facial Challenge to the Policy

Prisoners retain fundamental constitutional rights even though they are behind prison walls. See Procunier v. Martinez, 416 U.S. 396, 405-06 (1974). One such right is the free exercise of religion. See Mosier v. Maynard, 937 F.2d 1521, 1525 (10th Cir. 1991). However, a prisoner's right to exercise his religion is not absolute. Rather, the First Amendment requires that an inmate be accorded a reasonable opportunity to pursue his religion. Id. "[W]hat constitutes a reasonable opportunity must be evaluated with reference to legitimate penological objectives of the prison . . . ." Id. An infringement of a constitutional right is valid in prison if it is "reasonably related to legitimate penological objectives." Id. Four factors we have considered in making the reasonableness inquiry are: (1) whether a valid, rational connection exists between the prison policy and the legitimate governmental interest advanced as justification; (2) whether alternative means of exercising the constitutional right remain open to prisoners; (3) what impact accommodation of the asserted constitutional right will have on guards, other inmates, and the allocation of prison resources generally; and (4) whether alternatives exist that would

7

accommodate the prisoner's rights at little cost to valid prison interests. Turner v. Safley, 482 U.S. 78, 89-90 (1987); Mosier, 937 F.2d at 1225. For substantially the same reasons articulated in the district court's well reasoned order, we agree that IMPP 10-110 is "reasonably related to legitimate penological objectives" under the factors set forth in Turner.

First, the prison policy is a reasonable means of accomplishing a legitimate penological objective. The record reflects a rational relation between the policy and the prison's legitimate interests in preventing abusive behavior by inmates and maintaining security in the facility. The policy seeks to prevent resentment between inmates, decrease confusion for facility chaplains and security staff, and maintain internal security. In this case, the standard is satisfied.

Second, alternative means of exercising the constitutional right remained open to Mr. Stewart. In support of their summary judgment motion, the defendants' presented evidence that in 1996 the prison completely removed pork from the menu and became a non-pork facility. In addition, the defendants submitted an affidavit from a correction official indicating that breakfast was available to inmates before sunrise and dinner after sundown. The affidavit further stated that it was possible for inmates to remove food from their lunch trays to eat later in the day. Finally, the defendants presented evidence that Mr. Stewart generally attended lunch during the period in question. Therefore, it

8

would appear that Mr. Stewart could have observed dietary Ramadan restrictions – fasting during daylight hours and receiving a proper – without the special meals. Mr. Stewart presented no evidence to the contrary.

Finally, it was reasonable for the defendants to conclude that allowing an inmate to receive special religious benefits without formally changing incorrect files would adversely impact guards, other inmates, and the allocation of prison resources. Using official prison records to determine an inmate's religion utilizes few prison resources, applies universally to all inmates and, above all, is a neutral source for determining an inmate's religion. The record suggests no alternative to IMPP 10-110 that would accommodate Mr. Stewart's free exercise right at a reasonable cost to valid penological interests. Accordingly, IMPP 10-110 – rather than the alternative policy implicitly suggested by Mr. Stewart of allowing inmates to prove their religion through circumstantial evidence and affording prison officials the discretion to decide "ad hoc" what religion a particular person practices – accommodates prisoners' religious rights at the least costs to prison interests and is "reasonably related to legitimate penological objectives." Mosier , 937 F.2d at 1525.

**B.    The Application of the Policy**

9

Mr. Stewart also alleges that IMPP 10-110 was enforced maliciously and in bad faith. Specifically, he asserts that he was denied the special Ramadan meals in retaliation because he raised a similar free exercise claim in a habeas corpus action pending in a state court of appeals. It is true that a prison policy, constitutional on its face, can be applied in a unconstitutional manner. However, Mr. Stewart has failed to allege specific facts showing retaliation because of the exercise of his constitutional rights.

"We have held that '[p]rison official may not retaliate against or harass an inmate because of the inmate's exercise of his constitutional rights.'" Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998) (quoting Smith v. Maschner, 899 F.2d 940, 947 (10th Cir.1990). "'This principle applies even where the action taken in retaliation would be otherwise permissible.'" Id.

> As the Supreme Court made clear in Turner, however, it is not the role of the federal judiciary to scrutinize and interfere with the daily operations of a state prison, and our retaliation jurisprudence does not change this role. Obviously, an inmate is not inoculated from the normal conditions of confinement experienced by convicted felons serving time in prison merely because he has engaged in protected activity. Accordingly, a plaintiff must prove that but for the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place. An inmate claiming retaliation must allege specific facts showing retaliation because of the exercise of the prisoner's constitutional rights.

Peterson, 149 F.3d at 1144 (citations and internal quotations omitted).

10

In the present case, Mr. Stewart's conclusory allegation of bad faith fails to establish specific facts showing retaliation. The record reflects that Mr. Stewart did not receive the special meals because his official records indicated that he was Protestant. The fact that Chaplain Dow agreed to waive the ninety-day waiting period se forth in IMPP 10-110 after Mr. Stewart filed the required change of religion form casts further doubt on the argument that the initial denial of Mr. Stewart's requests for Ramadan meals was retaliatory. Moreover, Mr. Stewart has not alleged that the defendants failed to enforce the policy towards all inmates, and he has no right to be exempted from a valid, generally applicable prison regulation. While it would seem that there could have been a more timely and effective resolution of Mr. Stewart's unfortunate situation, the enforcement of IMPP 10-110 upon discovery that Mr. Stewart's official records stated that he was a Protestant does not rise to the level a constitutional violation.

### C.    Mr. Stewart's other Arguments

In addition to the free exercise claim, Mr. Stewart raises several arguments alleging bias on the part of the district court judge and abuse of discretion in allowing the appellees various extensions of time during the pre-trial procedures. However, after reviewing the record we have determined that these claims are meritless and therefore find in favor of the appellees on these issues.

11

## CONCLUSION

Accordingly, because IMPP 10-110 is reasonably related to legitimate penological objectives and because Mr. Stewart has failed to present any evidence that the defendants applied the regulation with retaliatory intent, we conclude that the district court properly granted summary judgment in favor of the defendants on Mr. Stewart's free exercise claim. In addition, Mr. Stewart's allegations of bias and abuse of discretion are without merit. Therefore, for the reasons stated above we AFFIRM the district court's grant of summary judgment in favor of the appellees, Don Thomas, Ronald Dow, and William L. Cummings.

Entered for the Court,

Robert H. Henry
Circuit Judge