

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-22-2005

# Lape v. Comm PA

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-1094

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Lape v. Comm PA" (2005). *2005 Decisions*. Paper 207.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/207

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 05-1094

SHAREN LAPE
a/k/a
Sharen Anderson,
Appellant

v.

COMMONWEALTH OF PENNSYLVANIA; PENNSYLVANIA DEPARTMENT OF
CORRECTIONS; JEFFREY BEARD, Deputy Secretary, PA
Dept. of Corrections, in his individual and official
capacity; THOMAS ROGOSKY, Director, PA Dept. of Corrections,
Bureau of Community Corrections, in his individual and
official capacity; ROBERT BELCIK, Regional Director, PA
Dept. of Corrections, Community Corrections - Region III, in
his individual and official capacity; KENNETH DEHUS, Center
Director, PA Dept. of Corrections, Community Corrections -
Region III, Center 2, in his individual and official
capacity; WILLIAM MORSE, Contract Facility Coordinator,
Region III, PA Dept. of Corrections, in his individual and
official capacity; PETER  BALESTREIRE, Personnel Officer,
PA Dept. of Corrections, in his individual and official
capacity; LINDA ESHELMAN, Regional Trainer, PA Dept. of
Corrections, Community Corrections, in her individual and
official capacity

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No.:  01-CV-02169
District Judge:  The Honorable Gary L. Lancaster

Argued October 20, 2005

Before: SMITH, BECKER, and NYGAARD, *Circuit Judges*

(Filed: November 22, 2005 )

Bradley M. Bassi
Jeffrey T. Olup  [Argued]
Bassi, McCune & Vreeland
111 Fallowfield Avenue
P.O. Box 144
Charleroi, PA 15022

Jill A. Devine
103 Main Street
West Newton, PA  15089
       *Counsel for Appellant*

Rodney M. Torbic
Christian D. Bareford [Argued]
Office of Attorney General of Pennsylvania
564 Forbes Avenue
Manor Complex
Pittsburgh, PA  15219
       *Counsel for Appellees*

---

OPINION OF THE COURT

---

SMITH, *Circuit Judge*.

Sharen Anderson was an employee of the Pennsylvania Department of Corrections

("DOC") at the Community Corrections Center #2 ("CCC #2") in Pittsburgh in 1998.  She

may have developed a relationship with Michael Lape, an inmate who was housed at that

facility, and she subsequently married him after he was paroled.[1] The DOC investigated Anderson's conduct and concluded that she had violated the DOC's Code of Ethics. For that reason, Anderson was discharged. In response, Anderson initiated this action against multiple DOC officials and employees alleging violations of her First, Fifth and Fourteenth Amendment rights, a claim of reverse racial discrimination under Title VII, and a state law claim under Pennsylvania's Whistleblower Act. After the District Court granted the DOC's motion for summary judgment on each of her claims, Anderson filed this timely appeal. For the reasons set forth below, we will affirm the judgment of the District Court.[2]

## I.

Anderson obtained a position with DOC in March 1992, and was transferred in early 1998 to CCC #2. Shortly thereafter, on March 30, Michael Lape was placed at CCC #2. Anderson was Lape's counselor until he was transferred to another facility in Pittsburgh on July 15, 1998. Lape telephoned Anderson at home complaining about this transfer. He also mailed correspondence to Anderson. She admitted that she may have sent Lape a Christmas card at the end of the year.

---

[1]Although Sharen Anderson changed her name to Sharen Lape, we will refer to her by her maiden name.

[2]The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. We exercise jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a District Court's grant of a motion for summary judgment. *Azzaro v. County of Allegheny*, 110 F.3d 968, 973 (3d Cir. 1997) (en banc).

On March 3, 1999, Lape was paroled. He and Anderson met socially shortly thereafter. On May 7, 1999, while vacationing together in Florida, Anderson and Lape were married. When Anderson returned to work after vacation, she added her husband to her medical coverage, but continued to use her maiden name at work.

Almost a year later, on April 4, 2000, Lape was readmitted as a parole violator. After serving time in several state correctional institutions, he was transferred in December of 2000 to the Gateway Braddock community corrections center, which was situated in Allegheny County. On March 19, 2001, while still housed at Gateway Braddock, Lape submitted a Resident Driving Privilege form requesting permission to operate his wife's motor vehicle. The form identified "Sharen Lape" as the owner of the vehicle. Bill Morse, Gateway Braddock's contract facility director, forwarded the request to Robert Belcik, the Regional Director for Community Corrections.

On Friday March 23, Anderson submitted a letter to Thomas Rogosky, Director of the Bureau of Community Corrections. The letter was copied to Belcik and Kenneth DeHus, the Director of CCC #2. Therein, Anderson explained why she believed that the current system of treatment for sex offenders at the Allegheny County facility was inadequate. She proposed that "a correctional employee be designated as a regional Sex Offender Treatment Specialist for the CCCs" and submitted a list of responsibilities and an outline to use for treatment. She also expressed her willingness to be considered for such a position if it was created.

On Monday, March 26, 2001, Belcik issued a memorandum to his superior, Rogosky, advising that Lape had submitted a request for driving privileges which indicated that his wife was Sharen Lape, and that Sharen Lape had the same address as Sharen Anderson, a corrections counselor at CCC #2. Belcik noted that Lape had been at CCC #2 but had been moved in July of 1998 "because of unsubstantiated information at that time that there may have developed a relationship between Michael Lape and Sharen Anderson." Belcik requested that an investigation be initiated to "determine if Article #6 or any other section of the [DOC] Code of Ethics has been violated."

Belcik's request was granted and an investigation was conducted by John Markel, who was with the DOC's Office of Professional Responsibility. In the meantime, Rogosky responded to Anderson's March 23 proposal and advised that a vendor had already been selected to provide sex offender treatment to CCC #2 residents.

Markel interviewed both Anderson and Lape on April 10, and completed his investigation on April 17, 2001. In his report, Markel concluded that the investigation "substantiated that Corrections Counselor II Sharen Anderson violated" sections B-6 and B-14 of the Code of Ethics.[3] A condensed form of Markel's report, entitled "Executive

---

[3]Section B-6 provides:

> There shall be no fraternization or private relationship of staff with inmates, parolees, or members of their families. This includes, but is not limited to, trading, bartering or receiving gifts, money and favors from the inmate or the inmate's friends, relatives, or representatives. Moreover, employes are not to deliver gifts or money to inmates' friends, relatives or representatives.

Summary," was submitted on April 23, 2001, by H. Clifford O'Hara, Director of the DOC's Office of Professional Responsibility, to DOC Secretary Jeffrey Beard. The summary also concluded that the investigation substantiated that Anderson violated sections B-6 and B-14 of the Code of Ethics as she

> became involved in a private relationship with inmate Michael Lape when he was a resident of Penn Pavilion. . . . They corresponded with each other while he resided at that facility and began dating almost immediately upon his release. Two months after his release, they were married.
> Corrections Counselor Sharen Anderson failed to report that she received correspondence from Inmate Michael Lape while he was a resident at Penn Pavilion. Counselor Anderson intentionally withheld information from the DOC with regard to her marriage, her name change and her husband's change of status upon his return to prison.

Thereafter, Anderson was notified that a pre-disciplinary conference would be held on May 8, 2001 to afford her an opportunity to respond to charges that she had violated sections B-6 and B-14 of the Code of Ethics "as a result of a relationship between [her]self and a resident at the Penn Pavilion Contract Community Corrections Center." Anderson attended the pre-disciplinary conference, together with Mia Giunta, a representative from the Pennsylvania Social Services Union ("PSSU"). DOC's representatives were Belcik, personnel specialist Peter Balestriere, investigator Markel, and Kim Killian, a secretary who subsequently prepared the typed minutes.

Section 14 of the Code of Ethics states:

> Employes will promptly report to their supervisor any information which comes to their attention and indicates violation of the law, rules, and/or regulations of the [DOC] by either an employe or an inmate, and will maintain reasonable familiarity with the provisions of such directives.

The minutes of the conference indicate that the charges of violating sections B-6 and B-14 of the Code of Ethics and Markel's executive summary were read. Anderson was given an opportunity to respond and she confirmed that she had received letters from Lape while he was at Penn Pavilion and that she had sent him a Christmas card. According to the minutes, "as a result of the letters she received from him while he was at Penn Pavilion, . . . 'seeds were planted' that led to her having 'romantic feelings' toward him and this lead to her accepting his telephone calls and the invitation to dinner once he was paroled." Anderson explained that she did not inform her supervisor of her marriage because she thought she would be fired inasmuch as Lape had previously been on her caseload.

The information regarding the pre-disciplinary conference was sent to Timothy Musser, Chief of the DOC Labor Relations Division. An employee from that division recommended a three to five day suspension. That recommendation was reviewed on May 15, 2001 by Daniel Tepsic, the Director of the Bureau of Human Resources. He recommended termination, explaining that Anderson "was involved w/ him while he was under our jurisdiction, & never informed mgt." That same day, Deputy Secretary Love concurred in the recommendation for termination.

Consistent with this decision, Belcik advised Anderson in a letter dated May 23, 2001, that she was terminated from her position as Corrections Counselor 2 effective May 17, 2001. The letter recited that she had been charged with violating Sections B-6 and B-

14 of the Code of Ethics. The letter explained that certain facts were established during a pre-disciplinary record on May 8, namely:

1.    As a result of an investigation conducted by the [DOC] office of Professional Responsibility, it has been verified that you, Ms. Anderson, became involved in a private relationship with an inmate by the name of Michael Lape, when he was a resident of Penn Pavilion, a contract Community Corrections Center. The investigation indicates that you corresponded with this inmate through the mail while he was a resident at that facility and began dating almost immediately upon his release. Two months after his release, you were married to this inmate.
2.    It has been substantiated that you, Ms. Anderson failed to report that you had received correspondence from this inmate while he was a resident at Penn Pavilion. It has been concluded that you intentionally withheld information from the [DOC], your Supervisor, the Regional Director, with regards to fraternization with an inmate, your marriage, your name change, and your husbands' [sic] change of status upon to [sic] his return to prison.
3     By your own admission, you indicted [sic] that you did not notify your supervisor of your marriage, because you were afraid to lose you [sic] job. It has also been substantiated that you were in fact aware of the [DOC] Code of Ethics requirement that you were subject to in this matter.

The letter further explained Lape's appeal rights.

On November 16, 2001, Anderson commenced this civil action against the following defendants: the Commonwealth of Pennsylvania; the Department of Corrections; Jeffrey Beard, the DOC Secretary; Thomas Rogosky, DOC's Director of the Bureau of Community Corrections; Robert Belcik, DOC's Regional Director for the Bureau of Community Corrections; Kenneth Dehus, DOC's Director for CCC #2; William Morse, DOC's Contract Facility Coordinator; Peter Balestreire, DOC's Personnel Officer; and, Linda Eshelman, DOC's Regional Trainer. The Complaint asserted five counts generally against all of the defendants. Counts I - III were entitled

8

"Deprivation of rights guaranteed by First, Fifth and Fourteenth Amendments to the US Constitution." Count IV alleged a conspiracy claim. Count V claimed that the defendants were liable under Pennsylvania's Whistleblower Act for wrongful discharge, 43 Pa. Con. Stat. § 1423.

In addition to initiating this civil action, Anderson filed a grievance with her union, the PSSU, and requested arbitration. Initially, PSSU recommended arbitrating her grievance. On November 8, 2002, however, PSSU advised Anderson that it had received a settlement offer and "determined that the settlement is sound. Therefore, we intend to accept this offer on your behalf, as the exclusive representative." Although Anderson appealed that decision to PSSU's parent union, the Service Employees International Union ("SEIU"), the SEIU advised Anderson on May 5, 2003, that its statewide grievance appeal committee agreed with the recommendation to accept the settlement offer and it closed her grievance.

In the meantime, the District Court allowed Anderson to amend her complaint to add a claim of reverse racial discrimination in violation of Title VII and the Pennsylvania Human Relations Act. The Court denied, however, a subsequent request in May of 2004 to amend her complaint yet again to assert her § 1983 claims against additional employees of the DOC, and to assert RICO and breach of the duty of fair representation claims against all of the defendants, the union, its parent, and the Attorney General's Office. Thereafter, the District Court granted the DOC's motion for summary judgment on each

9

of her claims. This timely appeal followed.

II.

Anderson contends that the District Court erred in denying her motion to amend because leave to amend should have been granted under *Foman v. Davis*, 371 U.S. 178 (1962), and because Rule 15(c) permits amendments to add defendants.[4] The few pages of Anderson's brief devoted to the denial of her motion to amend do not even focus on her claims alleging a RICO violation, a common law conspiracy claim, and a breach of the duty of fair representation. In the absence of any specific argument on appeal that these claims should survive, we deem these claims abandoned. *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993); *see also Laborers' Int'l Union v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue . . . will not suffice to bring that issue before this court") (internal quotation marks and citation omitted).[5]

---

[4]We review a district court's denial of a motion to amend under Rule 15 for an abuse of discretion. *Garvin v. City of Philadelphia*, 354 F.3d 215, 219 (3d Cir. 2003). If factual findings are reviewed, we review for clear error. *Singletary v. Pennsylvania Dep't of Corrections*, 266 F.3d 186, 193 (3d Cir. 2001). If the District Court's legal conclusions are at issue, our review is plenary. *Id.*

[5]Nonetheless, we note that the federal duty of fair representation claim is time barred, *see DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 172 (1983), and the state claim fails as a matter of law because Pennsylvania's Public Employee Relations Act does not provide union members with a cause of action against their bargaining agent. *Casner v. AFSCME*, 658 A.2d 865, 869 (Pa. Commw. Ct. 1995) (citing *Ziccardi v. Commonwealth of Pennsylvania*, 456 A.2d 979 (Pa. 1982)). The RICO claim against the state is barred by the Eleventh Amendment. *Robinson v. California Bd. of Prison Terms*, 997 F.Supp. 1303, 1307 (C.D. Cal. 1998); *see also Pedrina v. Chun*, 97 F.3d 1296, 1300 (9th Cir.

Because Anderson's § 1983 claim against the additional DOC officials and employees was time-barred, she had to satisfy the requirements of Rule 15(c). We conclude that Anderson's belated effort to join Killian and Markel fails because she identified these two individuals by name in her complaint and yet failed to assert any claim against them at that time. *See Garvin v. City of Philadelphia*, 354 F.3d 215, 221-22 (3d Cir. 2003) ("[A]n amended complaint will not relate back if the plaintiff had been aware of the newly named parties when she filed her original complaint and simply chose not to sue them at that time."). The claim against Musser must also fail because there is nothing in this record to establish that Musser was personally involved in the decision to discharge Anderson. As a result, there is no evidence to establish that Musser had either the notice or the knowledge required under Rule 15(c). *See Singletary v. Pennsylvania Dep't of Corrections*, 266 F.3d 186, 194-98 (3d Cir. 2001). It is a closer call whether the requirements of Rule 15(c) were met with regard to Tepsic, who made the recommendation to terminate Anderson. We need not address whether there was an abuse of discretion, however, inasmuch as his interests were sufficiently aligned with the other DOC officials that the claims against him may be resolved at this juncture and do

---

1996) (reiterating that government entities are incapable of forming the requisite malicious intent to support a RICO action). The RICO claims against the other defendants fail to satisfy Rule 9(b)'s particularity requirement. Moreover, we find the delay attendant to developing a RICO claim was a sufficient basis for denying leave to add this claim in light of the fact that the summary judgment motion was ripe for disposition. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (acknowledging that delay may be a basis for denying leave to amend).

11

not require remand.

## III.

Anderson claimed that her First Amendment right to free speech was violated because she was fired in retaliation for her March 23, 2001 letter, which identified a need that CCC #2 had with respect to certain types of offenders, proposed a solution, and expressed her willingness to fill a position should her suggestion be accepted. Anderson devoted a single paragraph in her brief to this claim, and that paragraph completely failed to address the elements necessary to reach a jury. This passing reference is insufficient to bring the issue before us. *Foster Wheeler Corp.*, 26 F.3d at 398. Yet even were we to conclude that Anderson's speech was on a matter of public concern, she has failed to adduce sufficient evidence to establish that it was a motivating factor in the decision to discharge her. *See Azzaro v. County of Allegheny*, 110 F.3d 968, 975 (3d Cir. 1997) (en banc) (discussing elements necessary for a claim of retaliation); *see also Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997) (instructing that if "timing alone" is the evidence adduced to establish the element of causation in a retaliation claim, the facts must be "unusually suggestive" of retaliatory motive). Accordingly, we will affirm the grant of summary judgment on this claim.

## IV.

Anderson also claimed that she was discharged in retaliation for her March 23, 2001 letter in violation of Pennsylvania's Whistleblower Act, 43 Pa. Con. Stat. § 1423.

12

This Act prohibits retaliating against an employee who "makes a good faith report or is about to report, verbally or in writing, to the employer . . . an instance of wrongdoing or waste." *Id.* Wrongdoing is defined by the Act as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation. . . ." 43 Pa. Con. Stat. § 1422. In light of the plain text of the statute, Anderson's whistleblower claim fails because her letter did not report an instance of wrongdoing.

V.

Anderson also alleged that the DOC violated her First Amendment association rights when it fired her because she was married to a parolee. As the District Court noted, there is no factual support for her claim that she was fired because of her marriage to a parolee. The May 23 letter advising her of her termination specifically indicated that she was being terminated because she had had a "private relationship with an inmate . . . when he was a resident of Penn Pavilion," had "failed to report" that she had received correspondence from an inmate, and had "intentionally withheld information" regarding her fraternization with an inmate, her marriage, and the change in her husband's status when he was reincarcerated as a parole violator. In the absence of some evidence that she was discharged because she was married to a parolee, we need not address that claim.

Because Anderson was terminated for violating the anti-fraternization rule set out in Section B-6 of the Code of Ethics, we have considered whether that rule violated her associational rights to marry and to maintain certain intimate human relationships. *See*

13

*Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984) (discussing First

Amendment's right of intimate association); *Zablocki v. Redhail*, 434 U.S. 374, 386

(1978) ("reaffirming the fundamental character of the right to marry" under the

Substantive Due Process Clause of the Fourteenth Amendment). Although Anderson is

not an inmate and her claim might arguably be subject to review in accordance with

*Procunier v. Martinez*, 416 U.S. 396, 409 (1974), because she received outgoing

correspondence, we will, in accord with the guidance of the Supreme Court's decision in

*Thornburgh v. Abbott*, 490 U.S. 401 (1989), apply the *Turner v. Safley* standard.[6] *Abbott*,

490 U.S. at 409-410 (discussing the applicability of *Turner v. Safley*, 482 U.S. 78

(1987)).

In *Turner*, the Supreme Court declared that "when a prison regulation impinges on

inmates' constitutional rights, the regulation is valid if it is reasonably related to

legitimate penological interests." 482 U.S. at 89. This analysis, the Supreme Court

instructed, requires consideration of several factors:

first, whether the regulation bears a "valid, rational connection" to a

---

[6]In *Abbott*, the Supreme Court considered a civil rights claim asserted by a class of both prisoners and publishers. 490 U.S. at 408-410. There, the Court instructed that the *Turner* standard of review "focuses on the reasonableness of prison regulations" and that this standard was preferred over *Martinez*'s less deferential approach because the latter was not sufficiently sensitive "to the need for discretion in meeting legitimate prison needs." *Abbott*, 490 U.S. at 409-410. In a footnote, the Court rejected the argument pressed by the prisoners and the publishers that it should focus on the "identity of the individuals whose rights allegedly have been infringed." *Id.* at 409 n.9. It explained that "any attempt to forge separate standards for cases implicating the rights of outsiders is out of step" with several decisions issued between *Martinez* and *Turner*. *Id.*

14

legitimate and neutral governmental objective; second, whether prisoners have alternative ways of exercising the circumscribed rights; third, whether accommodating the right would have a deleterious impact on other inmates, guards, and the allocation of prison resources generally; and fourth, whether alternatives exist that "fully accommodate[] the prisoner's rights at de minimus cost to valid penological interests.

*Fraise v. Terhune*, 283 F.3d 506, 513-14 (3d Cir. 2002) (quoting *Turner*, 482 U.S. at 89).

The first factor compels the conclusion, consistent with the Supreme Court's observations in *Overton v. Bazzetta*, 539 U.S. 126, 132-33 (2003), that the anti-fraternization rule in the Code of Ethics bears a reasonable connection to the legitimate state interest in maintaining security at its correctional facilities. The second factor focuses on whether there are alternative means of exercising the right to marry and to engage in certain intimate relationships. To be sure, prisoners and guards may enjoy these rights; the limitation imposed merely rules out relationships with "inmates, parolees and members of their families." *See Keeney v. Heath*, 57 F.3d 579, 581 (7th Cir. 1995) (observing that "burden on the right to marry was light or at most moderate" as a guard did not have to "take a vow of celibacy"). With regard to the third factor, we conclude that accommodating the right by allowing unfettered fraternization between correctional officers and inmates would have a deleterious impact on the staff and inmates of the correctional facility. Fraternization between guards and prisoners would not only increase the risk that contraband could be introduced into the facility, but would also compromise the respect and authority that must be commanded by correctional officers by giving inmates a basis to question their impartiality. "Just the suspicion of favored

15

treatment could create serious problems of morale. Prisoners not married or engaged to guards would attribute any differences in treatment between themselves and such prisoners to the relationship." *Id.* Finally, we are unaware of any ready alternatives that could fully accommodate this right at a de minimus cost to the interests of security at the facility. Accordingly, we conclude that the anti-fraternization rule is reasonably related to a legitimate penological interest and that the District Court appropriately determined that Anderson's associational claim lacked merit.

VI.

Anderson also alleged that the DOC officials and employees had deprived her of her procedural due process rights under the Fourteenth Amendment. In *Gilbert v. Homar*, 520 U.S. 924, 928-29 (1997), the Supreme Court reiterated that "public employees who can be discharged only for cause have a constitutionally protected property interest in their tenure and cannot be fired without due process. . . ." Accordingly, we must focus on whether "the procedures available provided [Anderson] with 'due process of law.'" *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000). We agree with the District Court that the requirements of due process were met in light of the notice she received, the hearing that was conducted, and the fact that she had a grievance and arbitration procedure available to challenge her discharge. *See Dykes v. SEPTA*, 68 F.3d 1564, 1572 (3d Cir. 1995); *Jackson v. Temple Univ.*, 721 F.2d 931, 933 (3d Cir. 1983) (concluding that employee's right to proceed to arbitration provided an adequate due process safeguard even if the

16

hearing conducted by the employer was biased).

Anderson argues that her due process rights were violated because the union settled her grievance before it was arbitrated. This fact does not alter our conclusion. As we pointed out in *Dykes*, the availability of the grievance and arbitration procedure is a factor in determining whether the process afforded is adequate. 68 F.3d at 1572. Whether an employee is able to successfully arbitrate her claim, however, is not determinative of whether the process was constitutionally adequate.

## VII.

According to Anderson, the DOC's conduct also violated her substantive due process rights under the Fourteenth Amendment. The property interest Anderson had in her public employment is not an interest that is protected by the Substantive Due Process Clause. *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 143 (3d Cir. 2000) (concluding that professor's tenured public employment was wholly state-created contract right that was not a fundamental property interest for purposes of the Substantive Due Process Clause); *see also Gikas v. Washington Sch. Dist.*, 328 F.3d 731, 736-37 (3d Cir. 2003) (following *Nicholas* and concluding that veteran's preference created by state law was not fundamental right protected by the substantive due process clause).

## VIII.

Anderson amended her complaint to include a claim of reverse racial discrimination. She alleged that she had been discriminated against because she was

17

Caucasian and the DOC had treated African-Americans more favorably. Contrary to the District Court's assertion, we have addressed what is necessary to establish a prima facie case of reverse discrimination in *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir. 1999). We declared that "all that should be required . . . is for the plaintiff to present sufficient evidence to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII." *Id.* Scrutiny of the record in this case shows that Anderson failed to satisfy this standard. The record contains evidence that the DOC disciplined both Caucasian and African-American employees for similar conduct. We will affirm the grant of summary judgment on Anderson's reverse discrimination claim.

IX.

Finally, we address Anderson's conspiracy claim. Because she failed to elaborate on the basis of her claim or to identify any evidence to support it, we conclude that she has abandoned it. *Kost*, 1 F.3d at 182.

In sum, we will affirm the District Court's grant of summary judgment for the defendants.