**Ralph Ratton HALL,
Plaintiff-Appellant,**

v.

**Captain CURRAN, Defendant-Appellee.**

**No. 925, Docket No. 86–2441.**

United States Court of Appeals,
Second Circuit.

Submitted March 24, 1987.
Decided May 6, 1987.

---

Ralph Ratton Hall, pro se.

Peter G. Crary, Asst. Atty. Gen. (Robert Abrams, Atty. Gen., State of N.Y., Peter H. Schiff, Deputy Sol. Gen., Dept. of Law, Albany, N.Y., and Wayne L. Benjamin, Asst. Atty. Gen., of counsel), for defendant-appellee.

Before KAUFMAN, PIERCE and PRATT, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Ralph Ratton Hall, a prisoner acting *pro se*, appeals from an order of the United States District Court for the Northern District of New York, granting summary judgment to the defendant, Captain John W. Curran. The issue is whether the district court correctly resolved the tension between the prisoner's First Amendment rights and the demands of prison security by granting summary judgment for the prison administrator. We conclude that it did not and, accordingly, we reverse the judgment of the district court and remand for further proceedings.

## I. *BACKGROUND*

In November 1981, Hall brought this civil rights action pursuant to 42 U.S.C. § 1983 against Captain Curran, the Deputy Superintendent for Security at the Clinton Correctional Facility, in which Hall was formerly incarcerated. Seeking a declara-

tory judgment and monetary damages, he alleged that Curran interfered with and censored his legal and non-legal mail in violation of his First, Sixth, and Fourteenth Amendment rights. Hall contended that Curran subjected his mail to surveillance without good cause and in violation of New York State Department of Correctional Services ("DOC") Directive 4422. He also claimed that Curran deliberately violated his right of access to the courts by improperly confiscating legal materials sent to him by two approved correspondents, Ms. Berg and Ms. Orr. Hall further asserted that the papers needed for the federal suit were his own writings. Finally, he claimed that his incoming and outgoing mail were delayed by prison officials as a result of the allegedly improper censorship.[1]

### A. SURVEILLANCE OF HALL'S MAIL

In partial response to Hall's discovery requests, Curran submitted two Interdepartmental Communications, each dated March 7, 1980. The first communication was Curran's request that surveillance of all mail to and from Hall, except legal and privileged mail, be authorized for 60 days. To support his request, Curran stated "Confidential information has been received that the inmate is involved in militant activities which could prove to threaten the safety and security of this facility." (Defendant's Supplemental Response to Plaintiff's Request for Production of Documents, March 7, 1983.) In the second communication, Superintendent E.S. LeFevre, in reliance on Curran's alleged "[c]onfidential information," granted surveillance authorization to the extent of incoming mail, excepting legal and privileged mail.

The surveillance order was renewed at 60-day intervals until approximately September, 1981. The renewal memoranda extended the surveillance authorization to outgoing mail, except legal and privileged mail. (Defendant's Motion for Summary Judgment, Exhibit B).

In his affidavit in support of summary judgment, Curran reaffirmed that the surveillance order was based on "confidential information" (Curran's affidavit, at paragraph 4) and was renewed because Hall's "correspondence periodically related to criminal activity and/or created a danger to security and order...." (Curran's affidavit, at paragraph 6). To substantiate this allegedly ongoing danger, Curran submitted copies of his memoranda to the DOC Assistant Deputy Commissioner Robert Nelepovitz. The memoranda described the following items of Hall's outgoing mail: 1) Hall's novel, sent to Lisa Berg, a staff person at Amnesty International, which Curran felt might contain information seriously affecting the safety and security of the prison; 2) a letter to Berg allegedly "discussing an obvious circumvention of correspondence procedures;" 3) a letter to Beverly Lubin allegedly referring to an acquaintance under consideration for " 'sponsor potential' by Green Haven Correctional Facility" and indicating, in Curran's opinion, that "underhanded activities may be planned;" 4) a letter Curran found to be "regarding possible illegal activities;" 5) a letter Curran described as "pertaining to military activities, illegal transactions, contraband, etc.;" 6) a letter to Berg discussing what Curran characterized as "the troubles currently plaguing Green Haven," in which Hall allegedly stated that he had been "building the fire" at that facility; and 7) a letter to the Commission of Correction, enclosed in an envelope addressed to Berg at Amnesty International, in which Hall described physical abuse of prisoners confined to the Special Housing Unit at Clinton.

Neither Hall's actual letters nor the details of Curran's "confidential information" were submitted by the defendant in support of summary judgment.

### B. CONFISCATION OF THE CCC DOCUMENTS

On October 10, 1980, in compliance with Directive 4422, Captain Curran notified

---

1. In his Objections to the U.S. Magistrate's Report—Recommendation, Hall alleged that one particular delay caused him to default in a habe-

as corpus action. Plaintiff's Objections to the U.S. Magistrate's Report—Recommendation, par. 7.

Hall that materials from the "Creative Communications Committee [CCC], a defunct organization at Green Haven Correctional Facility," had been confiscated from an envelope sent to Hall from Amnesty International USA. (Defendant's Motion for Summary Judgment, Exhibit D). Hall filed a grievance, contending that he had originally authored the expropriated documents and had sent them from Clinton to Berg to be photocopied and returned to him for use as exhibits in his pending federal lawsuit. Requesting the return of the documents, he also alleged that he was a representative of CCC and had a legal right to use its name. The DOC Grievance Committee denied Hall relief, however, stating that he had failed to establish his status as a representative of CCC. Hall then instituted this action.

## C. *THE MAGISTRATE'S REPORT—RECOMMENDATION*

Magistrate Conan recommended granting summary judgment for Curran, concluding that the requirements of Directive 4422(III)(G)(2) had been fulfilled because authorization had been placed in appellant's file and renewed every 60 days. The magistrate did not discuss the alleged "confidential information" basis for the original surveillance order and accepted without comment defendant's contention that the 60-day renewals were justified because periodically some of Hall's mail implicated security and order at Clinton. The magistrate also accepted Curran's opinion that the confiscated materials were unprivileged mail from an unapproved correspondent, ignoring Hall's claim that he had authored the documents.

In his objections to the magistrate's report, Hall continued to assert his claim that the confiscated papers were not third party mail, averring that he was the founder of CCC, which he described as an inmate organization at Green Haven that became defunct upon his transfer to Clinton. He submitted an article from a correctional

news publication which referred to him as the president of CCC. (Plaintiff's Objections to Magistrate's Report—Recommendation, Exhibit C.) Hall further claimed that Curran had violated Directive 4422(III)(G)(3) by failing to notify Berg of the confiscation.[2] He also argued that there had never been any justification for the monitoring of his mail and renewed his request to the court to order an *in camera* inspection of the alleged "confidential information" on which Curran claimed he originally relied. He contended that such information did not exist. (Plaintiff's Objections to Magistrate's Report—Recommendation, par. 2).

On October 8, 1986, the district court approved the Magistrate's Report–Recommendation and granted the defendant's cross-motion for summary judgment.

## II. *DISCUSSION*

### A. *SURVEILLANCE OF HALL'S MAIL*

The preservation of social order and the enforcement of our laws is one of the most basic tasks of government, and prisons are one essential means of accomplishing that task. The maintenance of safety and discipline in our penal institutions is best secured through the kind of professional administrative expertise that can be forged only in the crucible of day-to-day experience. Managing a prison is both a science and an art. Optimal penal environments are created slowly and individually. They do not spring whole from judicial decrees. For this reason, judges traditionally and wisely accord considerable discretion to corrections officials' judgments with respect to the continuing security and order of their institutions. Nevertheless, our usual judicial restraint in this area must be tempered at times by the mandates of the Constitution. When an inmate alleges violations of his First Amendment freedoms, we are bound to afford him a meaningful opportunity to prove his claim.

---

**2.** Directive 4422(III)(G)(3) states, in part: "When incoming general correspondence is withheld ..., notification shall be sent to the

sender and the intended correspondent of the action taken and the reasons therefore."

In the instant controversy, we find that Hall has raised material issues of fact concerning the alleged infringements of his First, Sixth, and Fourteenth Amendment rights and that his right to a reasonable opportunity to litigate his claim has been aborted by a premature grant of summary judgment.

 The standard for deciding whether a restriction on inmate correspondence constitutes an impermissible restraint of First Amendment rights is well settled. The "practice in question must further an important or substantial governmental interest unrelated to the suppression of expression ... [and] ... must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Procunier v. Martinez*, 416 U.S. 396, 413, 94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974). *See also, Washington v. James*, 782 F.2d 1134, 1139 (2d Cir.1986); *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1029 (2d Cir.1985). This intermediate scrutiny standard seeks to protect the "inextricably meshed" rights of both the writer and the intended recipient. *Martinez* 416 U.S. at 409, 94 S.Ct. at 1809. A prisoner is not stripped of his First Amendment rights at the cellblock door. Rather, he "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *see Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 129, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977). Similarly, the prisoner's correspondent, whether author or intended recipient, "derives from the First and Fourteenth Amendments a protection against unjustified governmental interference with the intended communication." *Martinez*, 416 U.S. at 408–409, 94 S.Ct. at 1808–1809.

In *Martinez, supra,* the United States Supreme Court invalidated a California prison regulation that "authorized, *inter*

*alia,* censorship of statements that 'unduly complain' or 'magnify grievances,' expression of 'inflammatory political, racial, religious or other views,' and matter deemed 'defamatory' or 'otherwise inappropriate.'" *Martinez*, 416 U.S. at 415, 94 S.Ct. at 1812. The Court found such censorship to be "far broader than any legitimate interest of penal administration demands," *id.* at 416, 94 S.Ct. at 1813, and held that "[p]rison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements[;] [r]ather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation." *Id.* at 413, 94 S.Ct. at 1811.

 Directive 4422 conforms to the *Martinez* requirement that the substantial government interest advanced must be unrelated to the suppression of expression. The Directive prohibits prison officials from inspecting outgoing general correspondence[3] unless there is "reasonable suspicion to believe that the contents of such mail endangers or threatens the safety and security of a facility or the safety and security of another person." Directive 4422(III)(B)(6). Similarly, incoming general correspondence[4] may not be read without "evidence that the correspondence may contain one or more of the following: a) Plans for sending contraband .... b) Plans for criminal activity including escape. c) Information which, if communicated, would create a clear and present danger to the safety of persons and/or the security and good order of the institution." Directive 4422(III)(G)(1).

 Hall alleged that the surveillance of his mail was ordered in violation of Directive 4422 and the First and Fourteenth Amendments. He argued that Curran's claimed "confidential information" never existed and that his mail was opened only because he is a frequent litigant and a

---

3. Excepted from this regulation are inmate to inmate correspondence, inmate business mail, and correspondence request mail.

4. The exceptions described in footnote 4 also apply here.

"jailhouse lawyer." Curran's conclusory memoranda submitted in support of his motion for summary judgment are not sufficient to put the controversy to rest. Indeed, although some of Curran's letters to DOC Assistant Deputy Commissioner Nelepovitz refer opaquely to "militant" or "illegal" activities, others suggest the possibility that the surveillance order may have been related to Hall's criticisms of prison administration and his political statements. For example, on August 4, 1980, Curran called to the Deputy Commissioner's attention a letter in which Hall alleged severe physical abuse of inmates in the Special Housing Unit. Hall's letter was addressed to Amnesty International, a human rights organization that internationally monitors the treatment of prisoners. In the light of Curran's judgment that this letter warranted official attention, it is far from clear that the concern he expressed in his other memoranda about Hall's "militant" activities and his novel was related to prison security, rather than to the suppression of expression.

Indeed, Hall's submission in response to the defendant's cross-motion for summary judgment denied that his outgoing mail violated any prison rules and stated that his novel had been placed with "professional literary agents;" that the "fire" he was building at Green Haven was political awareness based on "interpretations of alleged constitutional rights of prisoners;" and that his letters to Beverly Lubin were love letters.

The discovery permitted below was too limited to resolve this issue. In opposition to the cross-motion for summary judgment, Hall requested that the district court inspect *in camera* the confidential information upon which initial surveillance was authorized. The district court did not order production of the information. Nor was Hall's request that Curran produce copies of the letters he described to Nelepovitz granted.[5]

Hall has clearly raised a material issue of fact as to whether the prison's intrusion on his right of expression was related to prison security or to suppression of Hall's criticisms and political opinions. Moreover, his assertion that the surveillance was initiated because he is a "jailhouse lawyer" is uncontroverted by Curran and supported by Hall's considerable experience litigating in the federal courts.[6]

 Thus, we cannot say on this record that no genuine issue of material fact lingers and that appellee was entitled to judgment as a matter of law. *Washington v. James*, 782 F.2d 1134, 1140 (2d Cir.1986). Accordingly, we reverse and remand for further proceedings. Further discovery should be permitted, including the production (which may be *in camera* in the first instance) of documents relevant to the reason for the initial surveillance authorization and production of copies of any of Hall's correspondence forwarded to the DOC Deputy Commissioner by Curran. In the light of the necessity for additional discovery, it would be appropriate for the district court to review its decision to deny Hall appointment of counsel.

### B. CONFISCATION OF THE CCC DOCUMENTS

Hall's second argument directed to the district court was that the confiscation of the CCC materials violated his right of access to the courts because the papers were his own writings intended for use as exhibits in a pending federal action (S.D.

---

**5.** It appears that the letters were not in Hall's possession.

**6.** A partial listing of Hall's cases in this Court includes:

| | |
|---|---|
| *In Re: Hall,* | No. 86–3014 |
| *Hall v. Trautfield,* | No. 86–3009 |
| *Hall v. Henderson,* | No. 85–2334 |
| *In Re: Hall,* | No. 84–8112 |
| *In Re: Hall,* | No. 84–8052 |
| *In Re: Hall,* | No. 84–3047 |
| *In Re: Hall,* | No. 84–3049 |
| *In Re: Hall,* | No. 84–3055 |
| *Hall v. Supreme Court,* | No. 84–2167 |
| *Hall v. Coughlin,* | No. 83–2375 |
| *Hall v. Kalonick,* | No. 83–2396 |
| *Hall v. Henderson,* | No. 83–2007 |
| *Hall v. Kilanik,* | No. 82–2246 |
| *Hall v. Coughlin,* | No. 82–2101 |

N.Y., No. 80–Civ.–2169).[7] Hall contended that he had sent the papers from prison to Berg for photocopying for the litigation and that they were confiscated when she returned them to him. He submitted to the district court a news account[8], identifying him as the President of CCC, to rebut Curran's defense that the materials were from an unapproved correspondent organization. Hall further alleged that he had created the organization and that it had become defunct upon his transfer from Green Haven to Clinton, i.e., that he constituted the entire organization. Thus, he concluded that Directive 4422(III)(G)(7), permitting expropriation of contraband, was improperly applied to the CCC documents in violation of his right of access to the courts and his right to possess his own writings.[9]

Captain Curran has never argued that the papers confiscated or their intended use represented any threat to the security of the prison. Rather, he has maintained only that the materials did not comply with the correspondent approval procedures of Directive 4421. (Curran's Affidavit in Support of Summary Judgment, par. 8). Obviously, these procedures are inapplicable if the papers are Hall's own writings and CCC is now a defunct organization.

■ Reading the record in the light most favorable to Hall, we find that whether Hall authored the expropriated documents is a material fact remaining in dispute. *See Shapiro & Son Bedspread Corp. v. Royal Mills Assoc.*, 764 F.2d 69, 75 (2d Cir.1985); *Falls Riverway Realty, Inc. v. City of Niagara Falls*, 754 F.2d 49, 54 (2d Cir.1985); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980). Accordingly, we are compelled to conclude that dismissal on summary

judgment of Hall's claims that the confiscation of the CCC material violated his First, Sixth and Fourteenth Amendment rights was unwarranted. Upon remand, the district court shall order additional discovery on the question of Hall's alleged authorship of the CCC papers and their mailing origins.

## C. CONCLUSION

The judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.

---

7. Appellant also claimed Curran interfered with legal mail necessary to the prosecution of two other lawsuits. He cited them as *Hall v. LeFevre*, No. 80—Civ. 4415 and *Hall v. LeFevre*, No. 40211 [sic], but adduced no evidence to support these claims. (Plaintiff's Motion for Judgment on the Pleadings, par. 9)

8. Attached to Plaintiff's Written Objections to the U.S. Magistrate's Report—Recommendation.

9. In pressing his claim of a right to possess his own written work in prison, Hall relies on *Sostre v. McGinnis*, 442 F.2d 178, 202–204 (2d Cir. 1971), *cert. denied*, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), in which this court held that an inmate could not be punished for recording his own ideas, even where officials adjudged them to be inflammatory and racist, if the inmate indicated no intent to circulate the writings.