**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARK ALAN LANE,<br>    *Petitioner-Appellant*,<br><br>v.<br><br>JOSIAS SALAZAR,<br>    *Respondent-Appellee.* | Nos. 17-35868<br>17-35869<br>17-35870<br><br>D.C. Nos.<br>3:12-cv-02360-MC<br>3:13-cv-00005-MC<br>3:13-cv-00100-MC<br><br>OPINION |

Appeal from the United States District Court
for the District of Oregon
Michael J. McShane, District Judge, Presiding

Argued and Submitted November 6, 2018
Portland, Oregon

Filed December 20, 2018

Before: Ferdinand F. Fernandez and Sandra S. Ikuta,
Circuit Judges, and William K. Sessions III,[*]
District Judge.

Opinion by Judge Sessions

---

[*] The Honorable William K. Sessions III, United States District Judge for the District of Vermont, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's denials of three 28 U.S.C. § 2241 habeas corpus petitions arising from proceedings in which Mark Alan Lane, who was accused by the Bureau of Prisons of sending threatening letters from prison, was disciplined under BOP Prohibited Acts Code 203, which prohibits inmates from "[t]hreatening another with bodily harm or any other offense."

Lane contended that Code 203, construed to apply to non-true threats, is unlawfully broad and vague. The panel held that the Code 203's prohibition on threats of bodily harm addresses legitimate penological concerns in a manner that is sufficiently narrow to satisfy constitutional concerns. The panel also held that the BOP's actions were supported by sufficient evidence.

### COUNSEL

Elizabeth Gillingham Daily (argued), Assistant Federal Public Defender; Stephen R. Sady, Chief Deputy Federal Public Defender; Office of the Federal Public Defender, Portland, Oregon; for Petitioner-Appellant.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Natalie K. Wight (argued), Assistant United States Attorney; Kelly A. Zusman, Appellate Chief; Billy J. Williams, United States Attorney; United States Attorney's Office, Portland, Oregon; for Respondent-Appellee.

## OPINION

SESSIONS, District Judge:

In this consolidated appeal, Mark Alan Lane contests the denials of his three habeas corpus petitions filed under 28 U.S.C. § 2241. Lane was accused by the Bureau of Prisons ("BOP") of sending threatening letters from prison, and was disciplined under BOP Prohibited Acts Code 203. Code 203 prohibits inmates from "[t]hreatening another with bodily harm or any other offense." 28 C.F.R. § 541.3, Table 1. Lane contends that Code 203, construed to apply to non-true threats, is unlawfully broad and vague. He also argues that the evidence against him was insufficient. We disagree. The BOP's prohibition on threats of bodily harm addresses legitimate penological concerns in a manner that is sufficiently narrow to satisfy constitutional concerns. We also find that the evidence against Lane was sufficient. We therefore affirm.

## I.

On February 27, 2002, Lane was sentenced to 360 months in prison after convictions for drug and money laundering offenses. In 2008, Lane notified the BOP that he believed his underlying criminal sentence was illegal, arguing that the quantity of drugs involved in his offense was erroneously listed as 500 kilograms rather than 500 grams. He pursued

his argument through the BOP's Administrative Remedy Program, eventually appealing to the BOP Central Office. As part of his appeal, he included a handwritten letter stating, "I don't Think My judgement and Commitment was 'verified.' I'm going to bet my life. Are you willing to Bet a Guards Life?" The letter then repeated, "Bet a Guard's Life? I don't like it when people play Games with My life!"

As a result of this letter, Lane received an incident report for violating Code 203. On December 23, 2008, a Discipline Hearing Officer (DHO) held a hearing at which Lane was the only witness to testify. Lane denied the BOP's allegations, stating: "I was trying to let them know I was serious about what I was doing. I wasn't threatening anyone." The DHO nonetheless found that Lane had violated Code 203 and sanctioned him with a loss of 27 days of good time credit, 30 days in disciplinary segregation, and six months without phone privileges.

In 2009, Lane was again sanctioned for violating Code 203. The punishment was based upon statements made in two outgoing letters. The first, addressed to an individual named Brian Dempsey, stated: "I give Bureau of Prisons staff a chance to follow orders from the Civil Rights Division. I don't want to, I may be forced to take a life! . . . . Pray for me, that the last thing I want to do is cause the next person harm!" The second letter, sent to the United States District Court in Evansville, Indiana, stated in part: "When the deal goes done! I want to make sure they come for you and [Assistant United States Attorney] Mr. Brad Blackington (Criminal charges)." In a postscript, Lane wrote: "That steel does damage to the human body! I personal know!! I had to put some work in at Greenville. The fucker bled like a stuck

hog!! The guard asked that I just walk away and leave it alone."

At a June 10, 2009 hearing, Lane again asserted that he did not intend the letters to be threatening. The DHO considered the first letter a threat of bodily harm, as Lane had threatened to take a life. The second letter's identification of AUSA Blackington was viewed in conjunction with the reference to Lane having stabbed someone while in prison. The BOP again sanctioned Lane under Code 203.

In 2010, Lane addressed a letter to the Senate Judiciary Committee and then-Representative Mike Pence. The letter sought to expose what Lane characterized as criminal conduct by the government, and repeated the claim that his conviction was erroneous. At the end of the letter, Lane wrote: "I want to expose this criminal matter! The BUREAU OF PRISONS may not take action. I may be forced to protect myself and take a life. . . . I will never let the FEDERAL GOVERNMENT violate my rights, and not take action."

Lane was cited for violating Code 203, and a DHO held a hearing. Lane asserted in a written statement that he intended the language in question as self-defense and not a threat of bodily harm. The DHO found this assertion not credible given that Lane stated he would "take a life," and imposed punishment that included lost good conduct time, disciplinary segregation, and other sanctions.

After exhausting his administrative remedies with respect to each of the three disciplinary proceedings, Lane filed *pro se* habeas corpus petitions pursuant to 28 U.S.C. § 2241 in the United States District Court for the District of Oregon. The

district court denied the petitions, finding that "some evidence" supported the BOP's decisions.

On appeal, a panel of this Court found that it could not determine whether the evidence against Lane was sufficient without first determining how to define a "threat" for purposes of Code 203. *Lane v. Feather*, 610 F. App'x 628, 629 (9th Cir. 2015). Examining the plain language of Code 203, the panel found that the term "should be interpreted to prohibit all threatening statements, whether they amount to true threats or not." *Id.* The panel next found that its interpretation necessarily implicated Lane's First Amendment rights, meaning that Code 203 could only be valid if it satisfied the test set forth in *Procunier v. Martinez*, 416 U.S. 396, 413 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490 U.S. 401 (1989). Briefly stated, *Procunier* requires that where a regulation restricts prisoners from exercising their First Amendment right to send outgoing mail to non-prisoners, that regulation must (1) "further an important or substantial governmental interest unrelated to the suppression of expression" and (2) "be no greater than is necessary" to protect that interest. 416 U.S. at 413. The panel remanded the three cases to the district court for supplementation of the factual record with regard to those two points. *Feather*, 610 F. App'x at 629.

On remand, the government submitted an affidavit from a DHO asserting that Code 203 advances prison security, protects the public from harassing or intimidating communications, and promotes prisoner rehabilitation. The district court held that Code 203 satisfies the *Procunier* test and denied Lane's § 2241 petitions.

## II.

The district court's denial of Lane's petitions is reviewed de novo. *McNeely v. Blanas*, 336 F.3d 822, 826 (9th Cir. 2003). Purely legal questions, such as whether Code 203 violates the First Amendment under *Procunier*, are also reviewed de novo. *Royse v. Superior Court of State of Wash.*, 779 F.2d 573, 575 (9th Cir. 1986).

### A.

Lane first argues that Code 203 does not satisfy *Procunier's* two-part test. *Procunier* struck down California regulations allowing censorship of letters that "unduly complain," "magnify grievances," or "expres[s] inflammatory political, racial, religious or other views or beliefs" in correspondence between inmates and non-inmates. 416 U.S. at 399; *see also id.* at 415. As noted, the Supreme Court first held that interference with outgoing prisoner mail is only justified if the regulation furthers "an important or substantial governmental interest unrelated to the suppression of expression." *Id.* at 413. The Court further held that "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id.*

With respect to the first requirement, the Supreme Court identified three relevant governmental interests: "the preservation of internal order and discipline, the maintenance of institutional security against escape or unauthorized entry, and the rehabilitation of the prisoners." *Id.* at 412 (footnote omitted). "Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements.

Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation." *Id.* at 413

The second part of the test requires that the limitation be "no greater than is necessary" to protect such interests. *Id.* The Supreme Court has made clear, however, that *Procunier* should not be read "as subjecting the decisions of prison officials to a strict 'least restrictive means' test." *Abbott*, 490 U.S. at 411. Instead, *Procunier* "require[s] no more than that a challenged regulation be 'generally necessary' to a legitimate governmental interest," and that the regulation provide "a close fit between the challenged regulation and the interest it purported to serve." *Id.*

Here, the district court concluded that Code 203 enhances security and order within the prison. Lane's disciplinary history offers clear examples of how those legitimate governmental interests come into play. In at least three of the letters at issue, Lane threatened to kill someone. In one such letter he specifically threatened to kill a prison guard. As explained in one of Lane's disciplinary reports,

> [t]he action/behavior on the part of any inmate to make any sort of threat towards any person poses a serious threat to the health, safety and welfare of not only the person involved, but that of all other inmates and staff. . . . The behavior displayed by this violation of discipline could have lead [sic] to a more serious incident.

Courts are encouraged to defer to corrections officials on such judgments. *See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (noting that courts owe "substantial deference to the professional judgment of prison administrators"); *Hall v. Curran*, 818 F.2d 1040, 1043 (2d Cir. 1987) ("The maintenance of safety and discipline in our penal institutions is best secured through the kind of professional administrative expertise that can be forged only in the crucible of day-to-day experience.").

Prohibiting threats of bodily harm also serves the legitimate governmental interest of rehabilitation. In *Procunier*, where the letters at issue consisted of complaints and grievances, the Supreme Court found that prison officials had failed to "specify what contribution the suppression of complaints ma[de] to the rehabilitation of [prison inmates]." 416 U.S. at 416. In this case, the communications are far more serious in nature. Namely, they speak of lethal violence. As explained in the DHO's affidavit, part of the rehabilitation process is to help inmates transform their anger into nonviolent communication. By imposing reasonable sanctions as a consequence of violent speech, prison officials are furthering that effort at redirection and rehabilitation.

With respect to the second prong of the *Procunier* test, the government has shown that Code 203 is "generally necessary" to curb threats in outgoing mail, and that the regulation constitutes a "close fit" with its legitimate governmental interests. *Abbott*, 490 U.S. at 411. After *Procunier*, inmate complaints and other expressions of dissatisfaction are clearly protected from punishment. Threats of bodily harm, as noted above, constitute communications of a very different, more troubling nature.

As relevant to this appeal, Code 203 prohibits only those latter communications.

Lane argues that Code 203, as construed by the BOP, is overly broad because it encompasses conduct that does not implicate any legitimate penological concerns. As examples, he submits that the regulation could result in punishment for jokes, statements of predicted self-defense, or statements that the recipient unreasonably views as a threat. Lane further warns that prison inmates often suffer from mental illness or learning disabilities, and should not be punished for their unique styles of communication. These arguments are without merit. Lane himself is a strong example of how threatening language can be discerned and treated. In his letters, Lane posed the possibility of killing someone, including a prison guard. He cannot now seriously assert that those statements were either jokes or products of poor communication skills. As to unreasonable responses to prisoner communications, there is no indication that the BOP has sanctioned any such conduct. Instead, the BOP reasonably considered Lane's writings, identified legitimate penological concerns, and issued appropriate punishment.

Lane further argues that only true threats are punishable, while rhetoric and hyperbole are not. A panel of this court previously concluded that a threat under Code 203 includes non-true threats, and we are bound by the law of the case. *See Old Person v. Brown*, 312 F.3d 1036, 1039 (9th Cir. 2002). Moreover, whether the threats are true cannot be a litmus test for punishment, as prison officials should not be placed in the position of determining the credibility of what could reasonably be viewed as a threat. Indeed, *Procunier* warned that prison administrators must not "be required to show with certainty that adverse consequences would flow

from the failure to censor a particular letter. Some latitude in anticipating the probable consequences of allowing certain speech in a prison environment is essential to the proper discharge of an administrator's duty." 416 U.S. at 414. Finally, even if a threat is not intended to be acted upon, threats of bodily harm contribute to an atmosphere of hostility and disrespect. While curbing threats such as those penned by Lane might limit an inmate's expressive outlets, threats of bodily harm run counter to penological purposes and are legitimately curtailed. When read reasonably in light of the prison setting, Code 203 satisfies the two-prong test set forth in *Procunier*.

## B.

Lane next contends that because the BOP and this court have construed Code 203 as including non-true threats, the BOP has effectively promulgated a new substantive rule that must follow the Administrative Procedures Act's ("APA's") requirement for notice and comment. The APA places procedural requirements on an agency when it seeks to issue a rule. Those requirements do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). An interpretive rule "clarif[ies] or explain[s] existing law or regulations so as to advise the public of the agency's construction of the rules it administers." *Gunderson v. Hood*, 268 F.3d 1149, 1154 (9th Cir. 2001). "If a rule is inconsistent with or amends an existing legislative rule, then it cannot be interpretive." *Id.* (footnote omitted); *see also Mora-Meraz v. Thomas*, 601 F.3d 933, 939–40 (9th Cir. 2010).

In this case, correctional officials within the BOP interpreted a threat as something beyond a true threat. Assuming for the sake of argument that the BOP's interpretation constituted a change in course, its interpretation did not create a new substantive rule.  *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1207–08 (2015) (noting that an agency can interpret a regulation without effectively amending the underlying source of law); *see also White v. Shalala*, 7 F.3d 296, 304 (2d Cir. 1993) ("If the rule is an interpretation of a statute rather than an extra-statutory imposition of rights, duties or obligations, it remains interpretive even if the rule embodies the Secretary's changed interpretation of the statute."); *Metro. Sch. Dist. v. Davila*, 969 F.2d 485 (7th Cir. 1992) ("[A]n agency's change in its reading of a statute does not necessarily make the rule announcing the change [substantive]."). Indeed, the BOP merely interpreted Code 203 to cover threats that, as perhaps in this case, may not have been intended as true threats but were nonetheless threatening and unacceptable in a prison setting.  That interpretation did not create "new law, rights, or obligations," *L.A. Closeout, Inc. v. Dep't of Homeland Sec.*, 513 F.3d 940, 942 (9th Cir. 2008) (holding that internal memorandum providing an agency's construction of a regulation in a particular factual circumstance does not require notice and comment), and was not required to go through the notice and comment procedures set forth in the APA.

## C.

Lane further argues that by including non-true threats, the BOP has rendered Code 203 void for vagueness.  "A statute is void for vagueness when it does not sufficiently identify the conduct that is prohibited." *United States v. Makowski*,

120 F.3d 1078, 1080–81 (9th Cir. 1997) (quoting *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1995)). Courts have reasoned that vague statutes and regulations should be held void because: (1) individuals should not be punished for behavior they could not have known was illegal; (2) vague laws allow arbitrary and discriminatory enforcement; and (3) vague laws may have a chilling effect on free speech. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *see also United States v. Mincoff*, 574 F.3d 1186, 1201 (9th Cir. 2009) (a statute is impermissibly vague if it "'fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement'"); *Foti v. City of Menlo Park*, 146 F.3d 629, 638 (9th Cir. 1998). The Court must assess a constitutional challenge based on vagueness in a common sense manner. *See U.S. Civil Serv. Comm'n v. Nat'l Assoc. Of Letter Carriers AFL-CIO*, 413 U.S. 548, 578–79 (1973) (noting that "there are limitations in the English language with respect to being both specific and manageably brief, and it seems . . . that although [a] prohibition[ ] may not satisfy those intent on finding fault at any cost," a prohibition is not vague if it is "set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with").

When a statute "is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (internal quotation marks and footnote omitted). That said, in the prison setting "[i]mprecision in penal legislation should be tolerated if the language can be said nevertheless to give fair notice to those who might violate it." *United States v. Gilbert*, 813 F.2d

1523, 1530 (9th Cir. 1987) (citing *Grayned*, 408 U.S. at 112); *see also Meyers v. Aldredge*, 492 F.2d 296, 310 (3d Cir. 1974) ("we reject the view that the degree of specificity required of [prison] regulations is as strict in every instance as that required of ordinary criminal sanctions"). Accordingly, courts defer to prison officials' interpretations "unless fair notice was clearly lacking." *Hadden v. Howard*, 713 F.2d 1003, 1008 (3d Cir. 1984).

Code 203 is not unlawfully vague. The regulation does not prohibit threats generally, but rather is limited to threats of bodily harm or any other offense. Inmates are therefore on notice that they may not make threats of either bodily harm or other activities that violate the criminal code or BOP regulations. Moreover, the BOP's interpretation comports with a common-sense understanding of a threat. As the Seventh Circuit once explained, "[w]hen making a threat one hopes not to have to carry it out; one hopes that the threat itself will be efficacious. Most threats, indeed, are bluffs. But if the bluff succeeds in intimidating . . . it ought to be punished." *United States v. Velasquez*, 772 F.2d 1348, 1357 (7th Cir. 1985). We therefore find that although Code 203 encompasses non-true threats, it is not void for vagueness.

### D.

Finally, Lane argues that the evidence was insufficient to show that he violated Code 203. Lane has a liberty interest in his good time credits, and may therefore only be deprived of those credits if afforded due process. *See Bostic v. Carlson*, 884 F.2d 1267, 1269 (9th Cir. 1989), *overruled on other grounds by Nettles v. Grounds*, 830 F.3d 922, 931 (9th Cir. 2016) (en banc). In *Superintendent v. Hill*, 472 U.S. 445, 455–56 (1985), the Supreme Court held that revocation of

good time credits requires only a "modicum of evidence" to support the prison's decision. Accordingly, due process requirements are satisfied if there is "'some evidence from which the conclusion of the administrative tribunal could be deduced.'" *Id.* at 455. "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455–56.

Lane contends that none of the disciplinary actions imposed by prison personnel were supported by "some evidence" of a threat. He bases his argument on two claims: first, that the context of each statement shows that it was merely hyperbole; and second, that the statements did not target "another" as required by the regulation. The first statement at issue is the 2008 attachment to Lane's administrative remedy form, on which he wrote: "I'm going to bet my life! Are you willing to Bet a Guard's Life?" At the hearing before the DHO, Lane stated that he was not threatening anyone, and was instead "trying to let them know I was serious about what I was doing." His testimony suggests that he did not actually intend to kill a prison guard, but rather was stating a lethal threat in order to show his level of commitment. From the prison's perspective, this reasonably constituted a threat of bodily harm. The law requires only a "modicum of evidence" that Lane was making a threat. *Hill*, 472 U.S. at 455. That standard is satisfied by Lane's suggestion that he would kill a prison guard if not granted the relief he was seeking.

The 2009 letters to Brian Dempsey were equally threatening, as Lane stated that he "may be forced to take a life" and/or "cause the next person harm!" Lane's counsel argues that these statements were intended to communicate threats of legal, rather than physical, harm, as Lane's writings referred to his own sentencing error as an attempt on his (Lane's) life. Counsel's claim requires a tortured reading of Lane's statements, which plainly contemplated causing physical harm to another.

The threats against AUSA Blackington are less clear. The letter initially referenced legal action: "I want to make sure they come for you and Mr. Brad Blackington (Criminal charges)." However, elsewhere in the letter Lane spoke of "that steel" doing "damage to the human body," and suggested that he had stabbed someone in Greenville. These statements were perceived as threatening, and the Court should defer to prison officials in that interpretation.

Like his 2008 administrative papers and the Dempsey letter, Lane's 2010 letter to Congress threatened to take a life. As discussed above, prisons need not tolerate those kinds of statements, both for fear of escalation and for rehabilitative purposes. Accordingly, the district court properly concluded that the BOP's actions were supported by sufficient evidence.

**AFFIRMED.**